1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANDRE JONES, et al.,

                             Plaintiff(s),

v.

RABANCO, Ltd., et al.,

                             Defendant(s).

No. C03-3195P

ORDER GRANTING IN PART AND
DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO
PLAINTIFF WAYNE BURTON'S
CLAIMS

     This matter comes before the Court on Defendants' Motion for Partial Summary Judgment Dismissing Claims of Plaintiff Wayne Burton (Dkt. No. 324).  Having considered Defendants' Motion, Plaintiff Burton's Opposition, Defendants' Reply, and all other papers and documents relevant to this motion, the Court GRANTS Summary Judgment as to Plaintiff Burton's Retaliation, Violation of Public Policy, Negligent Supervision and Training, and Outrage claims and DENIES Summary Judgment as to Plaintiff Burton's Disparate Treatment, Hostile Workplace, and Negligent Infliction of Emotional Distress claims. Regarding the evidentiary issues raised by Defendants, the Court GRANTS Defendants' Motion to Strike the Declaration of Counsel Regarding AWARE line calls.  The Court DENIES Defendants' Motions to Strike the Declarations of Burton, Fuenzalida, Hornbuckle, and Dr. Freeman.

BACKGROUND

     Mr. Burton started work at Rabanco in 1998, before Allied bought the company.  He worked chiefly as a swamper and driver, and states that he noticed a major shift in the attitudes of people in management positions around April 2000. (Pl's Opp. at 2).  He alleges that he was in a constant state

ORDER - 1

of stress because he was afraid from that point on that he could lose his job just for being a minority. He alleges that after April 2000, many minority workers were fired from Rabanco and replaced by white employees, some of whom were relatives or friends of management. (Burton Decl. at 4, ¶4). On one occasion, he noticed that Gary Passmore had formed a line of mostly minority employees for discipline.  On another occasion, supervisor Carl Passmore threatened him with a pad of yellow post-it type notes, which were used to notify employees to come talk to management (usually for discipline purposes). Carl Passmore allegedly told Mr. Burton, that "he was going to put them on [him]." (Burton Opp. at 3).  Mr. Burton also allegedly heard from co-worker Mark Hornbuckle that Carl Passmore made the statement to other white workers at Rabanco that, "[g]etting rid of the s _ _ _ s and n_ _ _ _ _s will be like shooting fish in a barrel." (Burton Decl. at 5, ¶7).  Because he was concerned about these types of events, he was one of the employees who signed the June 26, 2001, complaint letter addressed to Allied CEO Van Weeldon.  Despite this letter, Mr. Burton alleged that things did not improve at Rabanco. Around April 11, 2002, supervisor Brent Fenske addressed Mr. Burton as "young buckwheat."  Later that day, co-worker Duane Benn taunted Mr. Burton with this same moniker as he was leaving work.  Although Mr. Burton complained about these incidents, he alleges that Mr. Fenske and Mr. Benn were not punished sufficiently.  He alleges that although Mr. Fenske was made to apologize, it was insincere. (Burton Decl. at 6, ¶8).

After these episodes, Mr. Burton alleges that he began to have frequent headaches and panic attacks that caused him to go see a professional counselor.  Due to the severity of these symptoms, he was out of work on disability.  When he returned, co-worker Duane Benn allegedly referred to him as, "the man with all the headaches."  When Mr. Burton told Mr. Benn to treat him more respectfully, Mr. Benn allegedly replied, "F_ _ _ you."  Mr. Burton reported this incident to manager Roger Van Valkenburgh, who responded that Mr. Burton should have fought Mr. Benn.  This comment troubled Mr. Burton because another minority employee had recently been fired for fighting. (Id. at 7-8, ¶¶11-13).  In May 2004, Mr. Benn again confronted Mr. Burton when he heard that Mr. Burton was planning on joining a grievance regarding the length of the garbage collection routes.  Mr. Burton

ORDER - 2

was talking with another co-worker about this matter when Mr. Benn walked by and asked, "Do you want to get your head cut off?"  Benn added, "You guys be just f_ _ _ ing around out there anyway." (Id. at 10, ¶18).  Mr. Burton interpreted this to be a racially aggressive remark.  He noted that this remark caused him to return to the doctor because he began to feel anxiety and panic attacks due to his hostile work environment. (Id. at ¶19).

Mr. Burton also feels that he was targeted by management for "secret" observation because he was a minority, noting that white drivers were not subject to this kind of monitoring. (Id. at 13, ¶24).  He also notes that he had to file a grievance to get his seniority date corrected, which was a routine matter about which he felt management dragged its feet because of the fact that he is a minority. Mr. Burton also alleges that supervisor Dan Marsden confronted him on several occasions after he had filed this grievance with accusations that he had missed pickups and missed "extras" along his route. Mr. Burton took time to track down the addresses of the alleged missed pickups and "extras" and was able to prove that the majority of these misses were not actually part of his route. However, he felt that the attempt to tag him with "misses" was a retaliatory attempt on the part of Mr. Marsden to build a disciplinary record against him.  (Id. at 15-16).

Although Mr. Burton was upset by these events, he avoided using the AWARE line to complain because he had heard that the substance of the calls was being transmitted to management and he was afraid of retaliation.  (Id. at 12-13, ¶23).  Although Mr. Marsden, Mr. Van Valkenburgh, and the Passmores were terminated by Rabanco, Mr. Burton expresses concern that other staff remain at the company who were complicit in the discrimination he has witnessed.  (Id. at 16-17, ¶28).

ANALYSIS

**I. Summary Judgment Analysis**

This matter is before the Court on Defendants' motion for summary judgment.  Summary judgment is not warranted if a material issue of fact exists for trial.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).  The underlying facts are viewed

in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment has the burden to show

initially the absence of a genuine issue concerning any material fact.  Adickes v. S.H. Kress & Co.,

398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden

shifts to the nonmoving party to establish the existence of an issue of fact regarding an element

essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  To discharge this burden, the nonmoving party

cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for

trial.  Id. at 324.

### II. Evidentiary Issues

Before addressing the substance of Defendant's motion to dismiss Mr. Burton's claims, the

Court will first address the materials submitted by Plaintiff in support of his case that Defendants ask

to be struck.  Proceeding in this manner allows the Court to rule on the evidentiary value of the

documents offered as evidence before considering them in the legal analysis of Mr. Burton's claims.

### A. Wayne Burton's Declaration

Rabanco argues that Wayne Burton's declaration should be struck because it contains hearsay

within hearsay, and inadmissable theories regarding other people's actions and Mr. Burton's

experiences. The Court finds that, for the most part, Mr. Burton's declaration is a recounting of his

own experiences and perceptions while working at Rabanco.  Included in this statement, are Mr.

Burton's statements regarding racially-hostile comments that he heard through other people that

supervisors made or reports of discrimination that he heard from other Rabanco workers.  These

appear to be the statements that Rabanco is classifying as hearsay.  However, these statements

constitute hearsay exceptions as either an admission by a party-opponent under Federal Rules of

Evidence 801(d)(2)(D), a "then existing mental, emotional, or physical condition. A statement of the

ORDER - 4

declarant's then existing state of mind, emotion, sensation, or physical condition," under Federal Rules of Evidence 803, or a statement against interest under Federal Rules of Evidence 804(b)(3). Because all of the statements that Mr. Burton makes about what other people said to him appear to fall under one of these three exceptions, the Court will allow all of the statements.

### B. The Hornbuckle Declaration

Rabanco argues that the Hornbuckle Declaration should be struck. Mr. Hornbuckle's declaration deals chiefly with his assertion that he heard Carl Passmore say to other white Rabanco employees that, "Getting rid of the s _ _ _ s and n_ _ _ _ _s will be like shooting fish in a barrel." There are also statements by Mr. Hornbuckle regarding his perception of how minorities were treated at Rabanco. These statements also fall into one of the three exceptions to the hearsay rules that the Court has cited above. As such, Mr. Hornbuckle's declaration will also be admitted into evidence.

### C. The Freeman Declaration

Rabanco argues that the Freeman Declaration should be struck but does not give very specific reasons to justify this action. Dr. Freeman states that he is a PhD psychologist, licensed to practice in Washington state, who is currently treating Mr. Burton for depression and panic disorder. (Freeman Decl. at 1). In his statement he discusses Mr. Burton's diagnosis and authenticates documents from Mr. Burton's previous mental health care providers as records of the type usually relied upon by an expert like Dr. Freeman. (Id. at 2). The Court credits these statements as the minimum required evidence of Dr. Freeman's expert knowledge. The Court will allow Dr. Freeman's affidavit and the attached documents into evidence.

### D. The Fuenzalida Declaration

Rabanco argues that the Fuenzalida Declaration should be struck. However, Rabanco does not provide proper page and line number citations for the material it finds objectionable in his statement. James Fuenzalida's affidavit mainly recounts his experiences working at Rabanco, recollections about projects he worked on, and what caused him to perceive a racially hostile working environment at Rabanco. The Court does not find that his statement constitutes hearsay, as

ORDER - 5

1   Defendants suggest, because it largely contains his impressions and memories of his experiences.   For

2   these reasons, striking Mr. Fuenzalida's declaration would be inappropriate.

3   ### E.  Declaration of Counsel Regarding AWARE Line Calls

4   Rabanco argues that Plaintiffs' counsel's declaration regarding AWARE line calls should be

5   struck because it allegedly contains an inaccurate description of the deposition testimony of Eileen

6   Schuler. Defendants have submitted a declaration of Ms. Schuler stating that she was unable to

7   authenticate the AWARE line documents submitted by Mr. Moote as a complete AWARE line

8   record. (Dkt. 394). Plaintiff's counsel has attached pages of Ms. Schuler's deposition where she

9   testifies about the AWARE line, but nowhere in the sections that are marked does she authenticate

10  the AWARE line document attached.  For this reason, the Court strikes Mr. Moote's AWARE line

11  declaration and the attached documents.

12  ### III.  Summary Judgment on Plaintiff Burton's Claims

13  Defendants are moving to dismiss all of the claims that Mr. Burton has asserted against them.

14  Plaintiff Wayne Burton is bringing claims for disparate treatment and hostile work environment under

15  the Washington Law Against Discrimination ("WLAD"), RCW §49.060.030, et seq. and 42 U.S.C.

16  §1981, Hostile Work Environment Public Policy Violation under Washington's common law,

17  Retaliation under WLAD and, Negligent Supervision and Training, Negligent Infliction of Emotional

18  Distress and Outrage. (See "Amended Clarification of Complaint Claims and Complaint

19  Amendments," Dkt. No. 281).  Although the Complaint does not state explicitly that Plaintiff is

20  bringing claims under 42 U.S.C. §2000e, et seq. ("Title VII"), the parties' motions, responses, and

21  replies all incorporate Title VII claims into their arguments.

22  ### A.  Disparate Treatment

23  In order to make out a prima facie case for racial discrimination based on disparate treatment

24  a Plaintiff must demonstrate that he: 1) belongs to protected class; 2) was treated less favorably in

25  terms of the conditions of his employment; 3) than a similarly situated, nonprotected employee.  The

26  Plaintiff must also show that he and the comparator were doing substantially the same work.

ORDER - 6

1  Washington v. Boeing, 105 Wn. App. 1, 13 (2001).  Washington has, for the most part, adopted the

2  burden-shifting approach articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),

3  making the test for disparate treatment under the WLAD similar to the federal test for disparate

4  treatment under Title VII. Hill v. BCTI Income Fund-I, 144 Wn. 2d 172, 180 (2001).

5         Mr. Burton is African-American and meets the definition of a member of a protected class for

6  this claim. In his briefing regarding his disparate treatment claim, Mr. Burton makes the argument that

7  he has sufficient direct evidence of discrimination that he need not engage in the McDonnell Douglas

8  burden-shifting test.  Indeed, a plaintiff claiming disparate treatment may prove such treatment

9  through direct evidence of intentional discrimination, such as a facially discriminatory policy, see City

10 of Los Angeles Department of Water and Power v. Manhart, 435 U.S. 702 (1978) or specific

11 statements made by the employer evidencing discrimination. See Owens v. New York City Hous.

12 Auth., 934 F.2d 405(2d Cir.), cert. denied, 502 U.S. 964 (1991).  In Trans World Airlines, Inc. v.

13 Thurston, 469 U.S. 111, 121 (1985), the Court found that plaintiffs had presented sufficient direct

14 evidence that their employer was applying a policy in a way that discriminated on the basis of age that

15 the court did not need to engage in the burden-shifting analysis.

16        Here, Mr. Burton has alleged that he was called "buckwheat" on two occasions and asked by

17 manager Roger Van Valkenburg, when Burton was sick from food poisoning, whether it was because

18 he ate chicken.  Mr. Burton also alleges that he heard from co-worker Mark Hornbuckle that

19 supervisor Carl Passmore said, "[g]etting rid of the s _ _ _ s and n_ _ _ _ _s will be like shooting fish

20 in a barrel." All of these instances are strong evidence that there was a negative racial animus against

21 minorities present at Rabanco.  Although Rabanco makes the argument that Mr. Van Valkenburg's

22 reference to chicken carried no objective racial animus, the Court finds that this argument is

23 disingenuous.

24        Additionally, Mr. Burton has presented, through the declaration of Mr. Fuenzalida, evidence

25 that white drivers who refused to bill extra pick-ups were being treated differently than minority

26 drivers who inadvertently forgot to bill extras.  (Fuenzalida Decl. at 2).  Rabanco claims that Mr.

ORDER - 7

1   Fuenzalida's declaration cannot support Mr. Burton's claims because Mr. Fuenzalida's report

2   concerns a driver who worked for Emerald City collections, which was not being monitored by the

3   city for missed pickups in the same way that U.S. Disposal (where Mr. Burton worked) was.

4   However, this affidavit supports Mr. Burton's claim because Mr.Fuenzalida states that he brought the

5   Emerald employee's record to the attention of his supervisor as someone who should perhaps be

6   disciplined.  Despite this action, Mr. Fuenzalida never heard that the Emerald employee had been

7   disciplined.

8           Under this analysis, the direct objective evidence of racially hostile comments circulated at

9   Rabanco and directed at Mr. Burton, as well as the circumstantial evidenc offered by Mr. Fuenzalida,

10  support an inference made in Mr. Burton's favor, as the non-moving party, that he likely was treated

11  differently for being a minority. Under this analysis, Mr. Burton has raised an issue of fact for the jury

12  regarding his claim of disparate treatment.  Rabanco's motion should be DENIED.

13          **B. Hostile Work Environment**

14          Mr. Burton brings claims under the WLAD and 42 U.S.C. §1981 for a hostile work

15  environment.  In order to make out a prima facie case for a racially hostile work environment, Mr.

16  Burton must show that: 1) he suffered unwelcome harassment; 2) the harassment was because of

17  race; 3) the harassment affected the terms and conditions of employment; and 4) the harassment can

18  be imputed to Rabanco.  Washington v. Boeing, 105 Wn. App. 1, 13 (2001).  The claim of hostile

19  work environment is aimed at redressing the wrongs that occur, "[w]hen the workplace is permeated

20  with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the

21  conditions of the victim's employment and create an abusive working environment." Harris v. Forklift

22  Systems, Inc., 510 U.S. 17, 21 (1993) (internal citations omitted).  In the case at hand, Mr. Burton

23  submitted evidence that he endured unwelcome harassment that was because of race.  For example,

24  Mr. Burton states that he was called "buckwheat" by his supervisor and another employee, asked if he

25  ate chicken by manager Van Valkenberg, and heard another employee state that a supervisor had

26  stated, "[g]etting rid of the s _ _ _ s and n_ _ _ _ _s will be like shooting fish in a barrel," among

other offenses. For these reasons, Plaintiff can establish that he meets the first two criteria for

establishing a prima facie case as to hostile work environment.  Rabanco contends, however, that

Plaintiff cannot establish that the harassment was sufficiently widespread to alter the terms and

conditions of his employment and that the harassment cannot be imputed to Rabanco.  Rabanco

reminds the Court that merely offensive behavior will not suffice. Id.

### 1) Harassment that Alters the Terms and Conditions of Employment

In order to show that harassment in the workplace is so prevalent and abusive that it creates a

hostile work environment, Plaintiff must show that the offending behavior was "both objectively and

subjectively offensive, one that a reasonable person would find hostile and abusive and one that the

victim in fact did perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

### a. Objectively Offensive

When assessing the objective portion of a plaintiff's claim, the Court assumes the perspective

of the reasonable victim. Harris, 510 U.S. at 22. In determining whether harassment in a plaintiff's

workplace was sufficiently severe or pervasive, courts must look at all the circumstances, including

the frequency of the discriminatory conduct, its severity, whether it is physically threatening or

humiliating or a mere utterance, and whether it unreasonably interferes with an employee's work

performance.  Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003).  The required

level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.

Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864, 872 (9th Cir. 2001).  Simple teasing,

offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the terms and conditions of employment.  Id.   However, in cases where several incidents

occur over time, the Court must aggregate the occurrences and analyze the situation as a whole to

determine if a hostile workplace existed.  Williams v. General Motors Corp., 187 F. 3d 553, 562-3

(6th Cir. 1999).

In Mr. Burton's case, Rabanco argues that the treatment to which he was subjected

constitutes a series of  "off-hand comments" and "isolated incidents."  However, Mr. Burton has

ORDER - 9

testified to many incidents of racism that he witnessed while at Rabanco. He remembers seeing

minority workers lined up for discipline and a supervisor threatening to discipline him with yellow-

sticky notes.  As noted earlier, Mr. Burton was also called several racially offensive names, asked

inappropriate, racially charged questions by a supervisor, and knew that another supervisor had

expressed his desire to get rid of minority workers. Taken in the aggregate and in the light most

favorable to him, Plaintiff's experiences raise an issue of fact as to whether or not a reasonable person

in his position would have found the harassment objectively offensive.

**b.  Subjectively Offensive**

If the victim does not subjectively perceive the environment to be abusive, the conduct has not

actually altered the conditions of the victim's employment, and there is not Title VII violation.

Nichols, 256 F.3d at 873 (quoting Harris, 510 U.S. at 21-22).  Hence, the Court must determine

whether Plaintiff, by his conduct, indicated that the alleged harassment was unwelcome. Id.  In the

case at hand, Mr. Burton testified that he was one of the employees who signed the complaint letter

to CEO Van Weeldon because he was concerned about the racial environment at Rabanco.  This is

behavior that would tend to indicate that he found the treatment he experienced subjectively offensive

and raises an issue of fact as to whether or not Mr. Burton found his work environment at Rabanco

subjectively offensive.

**2) Harassment that can be Imputed to Rabanco**

**a.  From Co-Workers**

Where an employee claims that her fellow co-workers are responsible for creating a hostile

workplace, Title VII's baseline negligence standard applies and a court must determine whether or

not an employer reasonably knew or should have known about the harassing conduct and failed to

stop it.  Burlington Indus. Inc., v. Ellerth, 524 U.S. 742, 758 (1998). If the answer to this question is

yes, then the Court must find an employer liable for the harassment. Id.  For the purposes of this

motion the Court finds that a question of fact exists as to whether or not Rabanco should have known

about Duane Benn's harassment of Wayne Burton.

1    Mr. Burton testified that Mr. Benn called him "buckwheat" while leaving work. Mr. Burton

2    also alleges that Mr. Benn's calling him the "man with all the headaches" and telling Mr. Burton, "f_

3    _ _ you" were racially motivated. Rabanco contends that it has a policy against harassment and, for

4    this reason, these comments cannot have been made in the course of Mr. Benn's work duties. For

5    this reason, Rabanco argues, Mr. Benn's comments cannot be imputed to Rabanco. However, "an

6    employer may not insulate itself from vicarious liability merely by adopting a general policy

7    proscribing bad behavior that would otherwise be actionable. . ." Robel v. Roundup, 148 Wn.2d 35,

8    54 (2002). Under Robel, the proper inquiry is whether an employee was fulfilling his job duties at

9    time. Id. In Robel, the deli workers at Fred-Meyers did not cease their job activities to taunt the

10    plaintiff, their disabled co-worker. Id. This case is analogous in some ways to the situation at hand.

11    While Rabanco can make the argument that Mr. Benn's "buckwheat" comment was not in the course

12    of his work, the second confrontation he had with Mr. Burton happened in the time room, in the

13    course of performing work-related tasks. Mr. Burton reported this incident to manager Van

14    Valkenberg. The previous confrontation with Benn had been reported to HR. Thus, an issue of fact

15    exists as to whether Rabanco knew or should have known about this conduct and whether it can be

16    imputed to the company.

17    **b. From Supervisors**

18    When evaluating whether or not an employer is liable for the harassment of its employees by

19    supervisors, the U.S. Supreme Court has adopted a vicarious liability standard. Burlington Indus.

20    Inc., v. Ellerth, 524 U.S. 742, 765. The justification for heightened liability when supervisors are

21    responsible for the creation of a hostile work place is that supervisors are able to use their position

22    within an organization to bring the weight of the organization to bear on an employee. Holly D. v.

23    California Institute of Technology, 339 F. 3d 1158, 1173 (2003). When a tangible employment

24    action "such as discharge, demotion, or undesirable reassignment" occurs as a result of the hostile

25    workplace created by a supervisor, there is no defense to this liability. However, when no tangible

26    employment action has occurred, the defendant employer may present an affirmative defense. Ellerth

ORDER - 11

at 765.  To succeed on the affirmative defense, an employer must show that it took reasonable

measures to prevent and correct the situation and that the employee unreasonably failed to take

advantage of these measures.  Id.

Regarding Mr. Burton's harassment by Brent Fenske and the "chicken" comment by manager

Van Valkenburg, Mr. Burton lodged complaints to HR about both incidents.  He asserts, however,

that the response he received was insufficient and insincere.  He alleges that supervisor Marsden told

him that he also called black people "buckwheat" and that supervisor Fenske treated the incident as a

joke.  Although Rabanco alleges that its offending supervisors were enrolled in a class for cultural

sensitivity and these issues were brought forth at a safety meeting,  Mr. Burton states that this was

not enough of a response.  Whether or not this response was sufficient is an issue for the trier of fact.

For this reason, the Court DENIES summary judgement as to Mr. Burton's hostile workplace claim.

### C.  Violation of Public Policy

Plaintiff Burton relies on Thompson v. St. Regis Paper Co., 102 Wn. 2d 219 (1984), to

support his claims that Rabanco's treatment of him violated public policy.  However,  Thompson is

not an employment discrimination case–it addresses the claims of a plaintiff who was dismissed from

his job after seventeen years of service without being given a reason, in contravention of contract

principles.  Id.  In Thompson, the Washington Supreme Court recognized for the first time that a tort

claim could exist for discharge in violation of public policy.  As noted, Mr. Burton has not been

terminated from his position at Rabanco.  For this reason, his claim of violation of public policy must

be DISMISSED.

### D.  Retaliation

Title VII and the WLAD also protect employees against retaliation for engaging in statutorily

protected activities targeted at stopping illegal discrimination.  In order to make out a prima facie

case for retaliation, Plaintiffs must demonstrate that: "(1) they were engaged in statutorily protected

activities, (2) an adverse employment action was taken, and (3) the statutorily protected activity was

a substantial factor in the employer's adverse employment decision." Schonauer v. DCR

Entertainment, 79 Wn. App. 808, 827 (1995). Rabanco alleges that Mr. Burton suffered no adverse

employment action while at Rabanco and notes that Mr. Burton is still employed.  Mr. Burton,

however, contends that a disciplinary letter that stayed in his file for a year after he successfully

contested it constitutes an adverse employment action.  Although the Ninth Circuit construed the

term "adverse action" broadly in Ray v. Henderson, 217 F. 3d 1234 (9th Cir. 2000), to include actions

such as having one's office moved or being excluded from meetings, Mr. Burton is unable to point to

any tangible negative consequence that the letter had for his job at Rabanco.  For this reason, the

Court GRANTS summary judgment as to Defendants' motion against Mr. Burton on this point.

### E.  Negligent Supervision and Training

In the Amended Clarification of Complaint Claims and Complaint Amendments (Dkt.

No. 281), Plaintiffs assert generally that Defendants are liable for the negligent supervision and

training of their employees and failed to take reasonable corrective action, presumably referring to the

events giving rise to this case.  This claim is made no clearer in Burton's Response to Defendants'

motions for summary judgment on this issue, which provides:

> The defense position is Mr. Burton has failed to show he was subjected to unlawful
> conduct or that the conduct was offensive.  The evidence shows he was subjected to
> unlawful discrimination and very offensive conduct.  The defense fails in this argument
> on summary judgment.  The decision is one for the jury.

(Dkt. No. 361 at 22).  This Response does not provide the Court with any evidence regarding

Rabanco's alleged supervision.  Bare assertions of this type will not support a Plaintiff's effort to

avoid summary judgment. Celotex, 477 U.S. at 323-24.  Accordingly, Mr. Burton's claim of

negligent supervision and training is DISMISSED.

### F. Outrage and Negligent Infliction of Emotional Distress

Defendants reiterate their motion for dismissal of Plaintiff's tort claims of Negligent Infliction

of Emotional Distress ("NIED") and Outrage. This Court has announced that it will determine for

each individual Plaintiff whether or not the factual scenario he presents is sufficient to support these

claims at the time Defendants bring a summary judgment motion as to that particular plaintiff.  In the

1   present case, Mr. Burton is not able to raise an issue of fact for the jury that he experienced the level

2   of conduct necessary to support an outrage claim.  However, the Court finds that Plaintiff has

3   succeeded in raising an issue of fact to support his NIED claim.

4       **a) Outrage**

5       The tort of outrage requires the proof of three elements: (1) extreme and outrageous conduct,

6   (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe

7   emotional distress." Kloepfel v. Bokor, 149 Wn. 2d 192, 195 (2003). An employer may  be held

8   vicariously liable for outrage committed by an employee if the person committing outrage was acting

9   in scope of her employment.  Robel v. Roundup, 148 Wn.2d 35, 53 (2002).  Whether a Plaintiff

10  suffered outrage is normally a question of fact for the jury, but it is initially for the Court as to

11  whether reasonable minds could differ as to whether or not outrage had been committed. Dicomes v.

12  State of Washington, 113 Wn. 2d 612, 630 (1989).

13      The Court also takes into account that outrage cannot stem from "mere insults, indignities,

14  [or] threats." Kloepfel v. Bokor, 149 Wn. 2d at 196.  Outrage must stem from behavior that is,

15  "'beyond all possible bounds of decency, . . .atrocious, and utterly intolerable in a civilized

16  community.'" Robel, 148 Wn. 2d at 51, (internal citations omitted).  Additionally,  the Court

17  recognizes that under applicable precedent, "[w]orkplace disciplinary actions such as writing

18  administrative reports, receiving oral reprimands, and internal affairs investigations" will not normally

19  support a claim of outrage. Kirby v. City of Tacoma, 124 Wn. App. 454, 474 (2004).  In evaluating

20  whether or not a claim of outrage could result in liability, the Court considers:

21          (a) the position occupied by the defendant; (b) whether plaintiff was peculiarly
            susceptible to emotional distress, and if defendant knew this fact; (c) whether
22          defendant's conduct may have been privileged under the circumstances; (d) the degree
            of emotional distress caused by a party must be severe as opposed to constituting mere
23          annoyance, inconvenience or the embarrassment which normally occur in a
            confrontation of the parties; and, (e) the actor must be aware that there is a high
24          probability that his conduct will cause severe emotional distress and he must proceed
            in a conscious disregard of it.

25

26

ORDER - 14

1  Birklid v. Boeing, 127 Wn. 2d 853, 867 (1995), (internal citations omitted). In considering these

2  factors, the Court recognizes that "'added impetus' is given to an outrage claim '[w]hen one is a

3  position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and

4  comments.'" Roebel, 148 Wn. 2d at 52 (quoting Contreras v. Crown Zellerbach Corp., 88 Wn. 2d

5  735, 741 (1977)).

6         The Court has extensively examined the factual record for Plaintiff Burton. The multiple

7  incidents of explicit and veiled harassment and racial hostility that he allegedly experienced is noted

8  above.  Also noted is the fact that many of these comments were made by people in positions of

9  authority, or those perceived to have authority.  Nonetheless, the occurrences of racial harassment

10 that Plaintiff reports are relatively far apart in time.  Based on this record, the Court does not find that

11 reasonable minds could differ as to whether Mr. Burton experienced behavior rising to the level of

12 outrage.  Although being subjected to the various types of discriminatory and hostile behaviors that

13 Plaintiff complains of would certainly be uncomfortable and offensive, Washington courts expect

14 Plaintiffs to "be hardened to a certain degree of rough language, unkindness and lack of

15 consideration." Grimsby v. Samson, 85 Wn. 2d 52, 59 (1975).  For these reasons, the Court

16 DISMISSES Plaintiff's Outrage claim.

17        **b) Negligent Infliction of Emotional Distress**

18        In order to support a claim for negligent infliction of emotional distress, a plaintiff must,

19 "establish a duty, a breach, proximate cause, and damage or injury." Haubry v. Snow, 106 Wn. App.

20 666, 678 (2001).  In Washington, an employer may be liable where its negligent actions injure an

21 employee–thus, the employer has a duty care to not engage in or tolerate behaviors that are injurious

22 to its employees. Id. at 678.  In establishing the injury, Plaintiff must submit admissible evidence that

23 he suffered from a diagnosable emotional disorder. Id. at 679.  Mr. Burton has provided such

24 evidence in the instant case through the affidavit of Dr. Freeman, who details his treatment of Mr.

25 Burton and affirms that Mr. Burton suffers from depression and panic attacks. (Freeman Decl. at 1,

26 ¶2).  Dr. Freeman links these disorders to the alleged harassment that Plaintiff Burton endured at

ORDER - 15

1   Rabanco. (Id. at 2, ¶5).  Plaintiff Burton has succeeded in raising an issue of fact as to all of the

2   elements of his NIED claim.  For this reason, the Court DENIES summary judgment on this cause of

3   action.

4                                                 CONCLUSION

5           The Court GRANTS Defendants' Motion to Strike the Declaration of Counsel Regarding

6   AWARE line calls.  The Court DENIES Defendants' Motions to Strike the Declarations of Burton,

7   Fuenzalida, Hornbuckle, and Dr. Freeman. Additionally, the Court GRANTS Summary Judgment as

8   to Plaintiff Burton's Retaliation, Violation of Public Policy, Negligent Supervision and Training, and

9   Outrage claims and DENIES Summary Judgment as to Plaintiff Burton's Disparate Treatment,

10  Hostile Workplace, and Negligent Infliction of Emotional Distress claims**.**

11          The Clerk of the Court shall direct a copy of this order be sent to all counsel of record.

12          Dated: April 26, 2006

13

14

15                                                          Marsha J. Pechman
                                                            United States District Judge

16  -

17

18

19

20

21

22

23

24

25

26

ORDER - 16