UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANDRE JONES, et al.,

                Plaintiff(s),

v.

RABANCO, Ltd., et al.,

                Defendant(s).

No. C03-3195P

ORDER GRANTING IN PART AND
DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO
THE CLAIMS OF  PLAINTIFF
LAWRENCE J. ORTIZ

This matter comes before the Court on Defendants' Motion for Summary Judgment Dismissing Claims of Plaintiff Lawrence J. Ortiz (Dkt. No. 379).  Having considered Defendants' Motion, Plaintiff Ortiz' Opposition, Defendants' Reply and all other documents and papers pertinent to this motion, the Court GRANTS Summary Judgment as to Plaintiff Ortiz' Title VII race discrimination claim, Retaliation, Violation of Public Policy, Meal/Rest Break Violation, Negligent Supervision, Willful Withholding of Wages, Negligent Infliction of Emotional Distress, and Outrage claims and DENIES Summary Judgment as to Plaintiff Ortiz' Racial and Age Discrimination claims under the Washington Law Against Discrimination, Hostile Work Place claims, and Overtime Wage Violation claims.  Regarding the evidentiary issues raised by Defendants, the Court DENIES all of Defendants' Motions to Strike.

BACKGROUND

Plaintiff Lawrence Ortiz began working for U.S. Disposal, a subsidiary of Defendant Allied Waste, in April 2000.  At the time, Mr. Ortiz was 63 years old.  He had been hired by U.S. Disposal after Allied had won a large portion of the Seattle waste disposal contract, part of which had been

held by General Disposal, Ortiz' former employer.  Mr. Ortiz was hired at the rate of $60,000 per year.  In addition, he was paid a $3,500 bonus and given four weeks paid vacation as part of his hiring agreement.

When Mr. Ortiz was hired, he was part of a team of people working to help U.S. Disposal implement new waste collection routes throughout the city of Seattle.  In this capacity, he drew on his forty-years' experience in the Seattle waste industry to give suggestions about how the routes should be designed and other logistical matters.  In addition, Mr. Ortiz oversaw the work of between 12-15 men as a foreman at U.S. Disposal.  In this role, Mr. Ortiz worked to schedule the routes and make sure he had enough people to staff them, get drivers out on the road in the morning, follow up with customer complaints, and report to the scene of accidents or injuries to do preliminary investigation and  take any injured employees to the hospital when necessary.

Beside these tasks, Mr. Ortiz also drove a small garbage truck for U.S. Disposal that was more maneuverable than the large garbage trucks used by most drivers.  As part of his daily job duties, Mr. Ortiz was also was responsible for picking up missed garbage cans ("misses") and collecting garbage and yard waste from tight, hard-to-reach areas that could not be reached with most of the regular trucks. (Ortiz Decl. at 11).  In general, Mr. Ortiz claims that he worked, on average, fifteen hours a day, starting around 5:30 a.m. and ending around eight or nine at night. (Id. at 2).  He also states that he worked most Saturdays. (Id.).

Starting in May 2000, Mr. Ortiz claims that he experienced a racially hostile work environment at U.S. Disposal and that he felt discriminated against due to both his race and his age.  He claims that he was aware of supervisors such as Gary Passmore and Dan Marsden using racial slurs in front of other employees (Id. at 7).  He states that he heard Dan Marsden use the word "n—er" in reference to another employee.  Additionally, Mr. Ortiz claims that he felt that minorities were unfairly targeted for discipline.  Mr. Ortiz alleges that minority drivers were given disciplinary notices for minor incidents for which white drivers were not disciplined.  Additionally, Ortiz alleges

1   that minority workers were barred from the office while white employees were allowed to enter the

2   office freely.

3          Beside the racially hostile environment that Mr. Ortiz alleges he experienced, Mr. Ortiz also

4   claims that supervisors Gary Passmore and Dan Marsden made it clear to him that they thought he

5   was too old for his job.  Mr. Ortiz claims that Mr. Passmore asked him why he didn't retire and that

6   both Passmore and Marsden made comments that Mr. Ortiz would be better able to do his job and

7   would work faster if he were younger. (Id. at 15).  Mr. Ortiz claims that after his termination in May

8   2001, he, Grady Torrey, and  Leonard McDade were replaced by younger, white workers Mike

9   Clawson, Gary Fox, and Brett Fenske.   Allied points out that Mr. Ortiz never heard a racial slur

10  during his employment at U.S. Disposal that was directed at him.  Allied also claims that the fact that

11  Mr. Ortiz was hired at age 63 disproves his allegation of age discrimination.  Finally, Allied contends

12  that Mr. Fenske and Mr. Clawson were not direct replacements for Mr. Ortiz and Mr. McDade and

13  they, in fact, worked for Emerald Disposal, a separate division of Allied Waste in Seattle.

14         Mr. Ortiz asserts federal and state claims of disparate treatment racial discrimination, age

15  discrimination and hostile work place discrimination, a claim of a public policy violation under

16  Washington law for creation of a hostile work environment, a claim of unlawful retaliation, tort

17  claims of intentional infliction of emotional distress (outrage) and negligent infliction of emotional

18  distress, as well as negligent supervision and overtime wage violation claims.  By this motion,

19  Defendants now move to dismiss the entirety of Mr. Ortiz' case.

20                                            ANALYSIS

21  **I. Summary Judgment Analysis**

22         This matter is before the Court on Defendants' motion for summary judgment.  Summary

23  judgment is not warranted if a material issue of fact exists for trial.  Warren v. City of Carlsbad, 58

24  F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).  The underlying facts are viewed

25  in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith

26  Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the evidence is such

1   that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby,</u>

2   <u>Inc.</u>, 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show

3   initially the absence of a genuine issue concerning any material fact. <u>Adickes v. S.H. Kress & Co.</u>,

4   398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden

5   shifts to the nonmoving party to establish the existence of an issue of fact regarding an element

6   essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>

7   <u>Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party

8   cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for

9   trial. <u>Id.</u> at 324.

10      **II.  Evidentiary Issues**

11          Before ruling on the substance of Defendant's motion to dismiss Mr. Ortiz' claims, the Court

12   will first address the materials submitted by Plaintiff in support of his case that Defendants ask to be

13   struck**.** Proceeding in this manner allows the Court to rule on the evidentiary value of the documents

14   offered as evidence before considering them in the legal analysis of Mr. Ortiz' claims.

15          **A.  Declaration Statements that are Allegedly Inconsistent with Mr. Ortiz' Deposition**

16          Defendants, in their Reply, cite several statements in Mr. Ortiz' declaration, which they claim

17   are inconsistent with his deposition testimony and "self-serving." (Defs' Reply at 1). The Court will

18   allow both deposition and declaration to serve as evidence, reducing the weight it gives to the

19   affidavit where there are inconsistencies. Minor inconsistencies between deposition testimony and an

20   affidavit will not provide a basis for excluding the affidavit. <u>Leslie v. Grupo ICA</u>, 198 F. 3d 1152,

21   1158 (9th Cir. 1999).

22          **B.  Statements Allegedly Not Based on Personal Knowledge**

23          Defendants also bring several statements in Mr. Ortiz' declaration to the Court's attention and

24   claim that these statements should be struck because they are not based on the personal knowledge of

25   Mr. Ortiz. (Defs' Reply at 2). The statements cited by Defendants reflect Mr. Ortiz' perceptions of

26   events at U.S. Disposal and people with whom he worked and are properly classified as an exception

to the hearsay rule under Fed. R. Evid. 803(3).  These statements reflect Mr. Ortiz' perception of the working environment at U.S. Disposal and are germane to the Court's present task of taking the totality of circumstances into consideration to determine whether or not an issue of fact may exist for trial on Mr. Ortiz' allegations.  See Schwapp v. Town of Avon, 118 F. 3d 106, 111 (2nd Cir. 1997).

### C.  The Bonnell Declaration

Defendants also argue that the declaration of Plaintiffs' expert Susan Webb Bonnell should be excluded because she does not explicitly state why her testimony is useful to Court, she does not attach the comparator files upon which she relies to the declaration in violation of Fed. R. Civ. P. 56(e), she reaches improper legal conclusions, and she relies on insufficient factual data. (Defs' Reply at 3).  Regarding Defendants' contention that the declaration is not helpful, Defendants cite a case where expert testimony by a human resources expert was struck because it only presented information that was "not so complicated as to require the testimony of an expert witness. . ." Wilson v. Muckala, 303 F. 3d 1207, 1218 (10th Cir. 2002).  The Court finds that Ms. Bonnell's declaration presents information regarding the comparator files that is complex enough to justify the use of expert testimony.  Accordingly, the Court will not strike the declaration for failing to meet the standard set forth in Fed. R. Evid. 702.

Defendants' second attack on the Bonnell declaration stems from the fact that Ms. Bonnell has not attached the comparator files she relies upon with the affidavit.  Plaintiff has stated that to file the comparator files with the Court would require the filing of approximately 15,000 pages of documents. (Pl's Resp. at 2).  Although Defendant is correct that Fed. R. Civ. P. 56(e) does normally require a party filing an affidavit to "attach and serve with" the affidavit certified copies of the documents referred to in the affidavit, the Court is authorized to apply this rule with some leniency. School Dist. No. 1J, Multnomah County, Or. v. AC and S, Inc., 5 F.3d 1255, 1261 (9th Cir. 1993). The Court agrees with Plaintiff that it does not want a 15,000 page filing, especially as the comparator files are documents that were produced by Defendants during discovery and which should

1   still be in Defendants' possession.  However, the Court advises both parties that should this case go

2   to trial, evidentiary standards will be applied rigorously.

3        As for Defendants' objections regarding improper legal conclusions and insufficient factual

4   data, the Court has reviewed the sections of the Bonnell affidavit to which Defendants have called the

5   Court's attention.  The Court finds that the conclusions drawn by Ms. Bonnell are not legal ones, but

6   conclusions that she reaches in her capacity as a human resources expert.  She will not, however, be

7   allowed at trial to make bald statements regarding whether or not someone experienced racial

8   discrimination.  Additionally, the Court finds that Ms. Bonnell's declaration is based on the

9   examination of numerous employee files and meets the factual data requirement of Fed. R. Evid. 702.

10   **D.  The Declaration of Counsel**

11        Defendants also move to strike Exhibits 1-4 to the Declaration of Counsel submitted in

12   support of Plaintiff's Response to the motion for summary judgment.  Under Fed. R. Civ. P. 56(e),

13   exhibits attached to affidavits for the purpose of summary judgment must be identified and

14   authenticated. "A trial court can only consider admissible evidence in ruling on a motion for summary

15   judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 ( 9th Cir. 2002), (citations

16   omitted).  Moreover, proper authentication of exhibits is a requisite for their admissibility. Id.  Here,

17   Mr. Moote attempts to authenticate the documents, based on his personal knowledge, but as

18   Defendants point out, this effort is insufficient because the affiant swearing to personal knowledge

19   of the documents must be someone through whom the documents could be admitted at trial.  Id.

20   Nonetheless, it is within the Court's discretion to conduct an independent analysis and admit into

21   evidence certain documents containing "a prima facie aura of reliability," even where they are not

22   properly authenticated. McLaury v. Duff & Phelps, Inc., 691 F. Supp. 1090, 1096, n.2 (D. Ill. 1988);

23   see also Coates v. Johnson & Johnson, 756 F.2d 524, 550 (7th Cir. 1985) (affirming District Court's

24   decision to admit items into evidence that appeared to be business records under Fed. R. Evid. 803(6)

1   in an employment discrimination matter).

2       The four exhibits that are contested by Defendants appear to be business records that were

3   kept by Defendants and which pertain to Mr. Ortiz' employment by U.S. Disposal. The first three

4   exhibits are all entitled, "Personnel Action Request." The first is signed by U.S. Disposal Operations

5   Manager Bruce Bentley, the second is signed by Gary Passmore, and the third is signed by Dan

6   Marsden. All three have been Bates stamped. The fourth document appears to be a Department of

7   Labor and Industries form filled out by Mr. Ortiz. At the top of the document, there is evidence that

8   the document was received by fax by Rabanco in February, 2003. The Court considers these indicia

9   of reliability to be sufficient that it will consider all four of these documents in support of Plaintiff

10  Ortiz' opposition to Defendants' motion for summary judgment.

11

12  **III. Summary Judgment on Plaintiff Ortiz' Claims**

13      Defendants are moving to dismiss all of the claims that Mr. Ortiz has asserted against them.

14  Plaintiff Lawrence Ortiz is bringing claims for disparate treatment and hostile work environment

15  under the Washington Law Against Discrimination ("WLAD"), RCW §49.060.030, et seq. and 42

16  U.S.C. §1981, Age Discrimination under RCW §49.44.090 and §49.60 *et seq.*, Hostile Work

17  Environment Public Policy Violation under Washington's common law, Retaliation under the WLAD,

18  Overtime Wage violations under RCW §49.52.050, Willful Withholding of Wages under RCW

19  §49.52.070, Meal and Rest Break violations, as well as Negligent Supervision and Training, and

20  Negligent Infliction of Emotional Distress and Outrage. (See "Amended Clarification of Complaint

21  Claims and Complaint Amendments," Dkt. No. 281). Although the Complaint does not state

22  explicitly that Plaintiff is bringing claims under 42 U.S.C. §2000e, et seq. ("Title VII"), both parties

23  refer to Plaintiff Ortiz' federal race discrimination claims. Defendants claim that Mr. Ortiz' Title VII

24  race discrimination claim should be dismissed because he never filed a complaint with the Equal

25  Employment Opportunity Commission ("EEOC").

26

**A. Title VII Claims**

Defendants claim that Mr. Ortiz has no standing to pursue a Title VII race discrimination claim because he has not exhausted his remedies by filing a complaint with the EEOC. (Def's Reply at 5, n.3). As support for this argument, Defendants cite B.K.B. v. Maui Police Dep't., 276 F. 3d 1091, 1099 (9th Cir. 2002). The Court in B.K.B. noted:

> In order to establish subject matter jurisdiction over her Title VII claim, Plaintiff was required to exhaust her administrative remedies. . .Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to investigate the charge.

Id., (citations omitted). In his deposition, Mr. Ortiz testified that he did not make a filing with the EEOC regarding his treatment at U.S. Disposal (Ortiz Dep. at 243, ln. 19). Although Plaintiff argues the merits of both his state and federal claims in his Response, he has provided the Court with no evidence regarding whether or not he exhausted his administrative remedies. For this reason, the Court finds that it does not have subject matter jurisdiction over these claims and GRANTS summary judgment as to Mr. Ortiz' Title VII allegations.

**B. Washington Law Against Discrimination ("WLAD") Claims**

**1) Disparate Treatment–Race and Age**

In order to make out a prima facie case for racial or age discrimination based on disparate treatment under the WLAD a Plaintiff must demonstrate that he: 1) belongs to protected class; 2) was treated less favorably in the terms and conditions of his employment; 3) than a similarly situated, nonprotected employee. The Plaintiff must also show that he and the comparator were doing substantially the same work. Washington v. Boeing, 105 Wn. App. 1, 13 (2001). Washington has, for the most part, adopted the burden-shifting approach articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), making the test for disparate treatment under the WLAD similar to the

federal test for disparate treatment under Title VII and the ADEA. <u>Hill v. BCTI Income Fund-I</u>, 144

Wn. 2d 172, 180 (2001); <u>Johnson v. Express Rent & Own, Inc.</u>, 113 Wn. App. 858, 860, n.2 (2002).

Once the Plaintiff has demonstrated that he can make out a prima facie case for disparate treatment,

the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the way the

employee was treated. <u>Johnson v. Dep't of Soc. & Health Servs.</u>, 80 Wn. App. 212, 227 (1996). At

this point, the burden falls to the Plaintiff to show that the employer's rationale for its actions is

pretextual. <u>Id.</u> An employee can demonstrate pretext by submitting evidence that a non-minority

comparator committed infractions that were similarly serious, but was not disciplined to the same

degree as the minority or older employee. <u>Id.</u> Although the final burden of proof always rests with

Plaintiff under this paradigm, the burden-shifting mechanism was designed to allow Plaintiffs a fair

chance at proving discrimination through indirect, circumstantial evidence, as is often necessitated in

discrimination cases. <u>Hill</u>, 144 Wn. 2d at 180. Because of the fact-intensive nature of this inquiry,

once Plaintiff has demonstrated that he is able to make out a prima facie case of race or age

discrimination, summary judgment will generally be inappropriate. <u>Johnson</u>, 80 Wn. App. at 229.

**2) Disparate Treatment Claim Under the WLAD**

Mr. Ortiz is Latino and meets the definition of a member of a protected class for this claim. In

the case at hand, Mr. Ortiz claims that management at U.S. Disposal banned  minority employees

from the office, which interfered with his ability to complete his job tasks. (Ortiz Dep. at 236, Ortiz

Decl. at 8-9). Mr. Ortiz also alleges that he was disciplined more harshly for minor infractions than

white employees and that his termination was due, in part, to the fact that he was a minority. (Ortiz

Decl. 12-13). After his termination, Mr. Ortiz claims that he and other minority foremen were

replaced by Brent Fenske, Mike Clawson, and Gary Fox, who are white and who were paid more to

do the same jobs that he and the other minority foremen did. (<u>Id.</u> at 16). His statements are

corroborated by the declaration of Susan Webb Bonnell, (Bonnell Decl. Re: Ortiz at 5-6), James

Fuenzalida, (Fuenzalida Decl. at 2), and Larry Pope (Pope Decl. at 2). These allegations, along with the supporting evidence submitted, support a prima facie showing of disparate treatment of Mr. Ortiz on the basis of his Latino identity in this matter.

Having determined that Plaintiff has demonstrated a prima facie case of racial discrimination in this matter, the burden now shifts to Defendants to offer a legitimate, non-discriminatory reason for the behaviors alleged. McDonnell Douglas, 411 U.S. at 802. Defendants claim that Mr. Ortiz' claims must fail because he was terminated due to his four accidents in just over four months and because his performance as a supervisor was poor. Allied argues that Mr. Ortiz may not claim his termination as an "adverse employment action" because after his termination he pursued a union grievance that allowed him to resign instead. Defendants argue that Ortiz is barred from basing any claim on his termination under the principle of "accord and satisfaction." However, Mr. Ortiz claims that he likely would not have chosen to retire so soon, had he not been forced to do so. (Ortiz Dep. at 221, ln. 16-17). Allied also claims that Mr. Ortiz testified that it was only the drivers below him at U.S. Disposal who did not have access to the office.

Defendants' support their argument as to "accord and satisfaction," with a case that cites California law as to accord and satisfaction. See Keppard v. Int'l. Harvester Co., 581 F. 2d 764, 767 (9th Cir. 1978). Defendants offer no further legal support for this argument. California's law as to accord and satisfaction is irrelevant to the current matter. For this reason, the Court will not adopt Defendants' argument that Mr. Ortiz can make no discrimination claims that are supported by the fact of his termination.

In opposition to Defendants' motion for summary judgment, Mr. Ortiz notes that, along with him, other minority foremen were terminated and replaced by white men, who were paid at a higher rate than the minorities had been paid. Mr. Fuenzalida's and Mr. Pope's declarations corroborate this statement, even though Defendants claim that the white supervisors who Plaintiff references  worked

at a different Allied division and were not replacements for Mr. Ortiz, Mr. McDade, and Mr. Torrey. Cf. (Def's Reply at 6), (Fuenzalida Decl. at 2).  Ms. Bonnell's expert human resources opinion also supports Mr. Ortiz' position.  She also notes that Caucasian Brent Fenske was promoted into a comparable position as that occupied by Mr. Ortiz and was paid more, despite having had six accidents in five years. (Bonnell Decl. re: Ortiz at 4).  Although Mr. Fenske's accidents were spread out over a greater period of time, viewing the facts in the light most favorable to Mr. Ortiz, Fenske's promotion along with the alleged pay disparity gives rise to an inference of pretext against Defendants regarding the level of discipline that Mr. Ortiz faced due to his accidents and his termination. Because the parties have presented conflicting evidence regarding whether or not Mr. Ortiz, Mr. McDade, and Mr. Torrey were replaced after they were terminated, an issue of fact exists for trial as to whether or not Fenske, Clawson, and Fox were replacements for these men and whether or not Ortiz, as a minority, was subjected to harsher disciplinary action than his white peers.

Additionally, upon examination of the deposition testimony of Mr. Ortiz, it is clear that his testimony, taken in context, was that he was barred from the office, along with other employees. (Ortiz Dep. at 236-37).  Mr. Ortiz testified that, "we couldn't even get access to go into the office there." (Id. at 236, lns. 20-21).  Later, he says, " [i]t was taboo for a minority. . .[s]ometimes I had a heck of a time trying to get something done on a truck or something, talk to somebody, you were ignored."(Id. at 273, lns. 2-3, 5-7).  Although it is true that Defense counsel later asked him, "[s]o it's your testimony that towards the end of your employment the drivers under you at U.S. Disposal, they had limited access to the office, correct?" and Mr. Ortiz answered, "[r]ight," (Id., lns. 16-19), this answer does not preclude the possibility that Mr. Ortiz was also banned from the office, along with the subordinates that Allied's attorney asked about specifically.  The Court views the facts in the light most favorable to the non-moving party on summary judgment. Matsushita, 475 U.S. at  587. Accordingly, the Court does not find that Defendants have successfully refuted the claim that Mr.

ORDER - 11

1    Ortiz, as a  minority, was treated adversely by being banned from the office.  On this basis, the Court

2    finds that an issue of fact remains for trial.

3        **2) Alleged Age Discrimination**

4        Mr. Ortiz was 63 years old when he was hired at U.S. Disposal.  His employment at U.S.

5    Disposal lasted a little longer than a year.  Mr. Ortiz claims that he was terminated, in part, because of

6    his age.  The Court will apply the same burden-shifting analysis to this claim as it did to Mr. Ortiz'

7    racial discrimination claim.  <u>See</u> <u>generally</u>, <u>Hill</u>, 97 Wash.App. 657.  In support of his prima facie

8    showing of age discrimination, Mr. Ortiz claims that supervisors Gary Passmore and Dan Marsden

9    made several negative comments regarding Ortiz' age to him.  For example, Mr. Passmore allegedly

10   asked Mr. Ortiz why he didn't retire.  Mr. Ortiz also claims that Mr. Passmore remarked that if he

11   were younger, he would be better able to do his job. (Ortiz Dep. at 244). He also alleges that when he

12   was terminated, his position was filled by a younger, white man named Mike Clawson.  The affidavits

13   of Mr. Fuenzalida and Mr. Pope, submitted in support of Mr. Ortiz' position, support the allegation

14   that Mr. Clawson did, indeed, replace Mr. Ortiz.  Mr. Pope notes, "Mr. Clawson actually used the

15   same truck Mr. Ortiz used and did the same route work of Mr. Ortiz." (Pope Decl. at 2).  These

16   allegations and the evidence submitted raise a prima facie case of age discrimination.

17       As noted earlier, Defendants argue that Mr. Ortiz was terminated because of his poor

18   performance as a supervisor and because of the accidents he had while employed with U.S. Disposal.

19   The Court has already recognized that the declaration of Mr. Ortiz' expert Susan Bonnell raises an

20   issue of fact as to whether or not the discipline and eventual termination Mr. Ortiz received for his

21   accidents and alleged poor performance were equally meted out to all employees regardless of race.

22   The same can be said of age, especially in light of the claim that three older supervisors were allegedly

23   replaced by three younger supervisors.

Allied also argues that Mr. Ortiz cannot claim discrimination of any sort because he was hired and fired by the same company during a short period of time.  The Ninth Circuit has held that when "'the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.'"  Coleman v. Quaker Oats Co., 232 F. 3d 1271, 1286 (9th Cir. 2000), (quoting Bradley v. Harcourt, Brace, and Co., 104 F. 3d 267, 270-71 (9th Cir. 1996).  In making this argument, Defendants note that although there was a supervisory change between Bob Evans (who hired Ortiz) and Gary Passmore (who fired him) this difference was negated by the fact that Bob Berres was the District Manager during the entire period that Mr. Ortiz worked at U.S. Disposal. (Defs' Reply at 8). However, nowhere in the pleadings or documentation presented, is there any evidence that Mr. Berres was involved in the day-to-day personnel decisions at the Allied companies.  Moreover, in Coleman, the Ninth Circuit based its decision on the fact that the plaintiff employee's direct supervisor both created a special position for him to prevent him from being laid-off, yet did not recommend him for an even greater promotion several months later.  232 F. 3d at 1286.  In the case before this Court, Defendants concede that Mr. Ortiz' direct supervisor did change during the time period in question.  For this reason, Defendants' argument is unavailing and the Court finds that there is a genuine issue of fact for trial as to whether or not Mr. Ortiz experienced age discrimination that led to the disciplinary actions against him and to his termination.

**C.  Hostile Work Environment under the WLAD and 42 U.S.C. §1981**

Mr. Ortiz also claims that he was subject to a hostile work environment under the WLAD and 42 U.S.C. §1981.  In order to make out a prima facie case for a  hostile work environment, Mr. Ortiz must show that: 1) he suffered unwelcome harassment; 2) the harassment was because of race or age 3) the harassment affected the terms and conditions of employment; and 4) the harassment can be imputed to Defendants.  Washington v. Boeing, 105 Wn. App. 1, 13 (2001).  The claim of hostile

work environment is aimed at redressing the wrongs that occur, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal citations omitted).

As part of his hostile workplace claim, Mr. Ortiz alleges that he heard Dan Marsden use the word n---er, that he knew that Gary Passmore fired many minorities with experience and hired his relatives and friends who shared his racist views instead, that he observed minority employees being barred from the office and heard that they were being subjected to harsher disciplinary measures than their white counterparts, and that he heard from other minority co-workers several reports of supervisors such as Gary Passmore and Dan Marsden using racial slurs. (Ortiz Decl. at 15). Mr. Ortiz also alleges that he was aware that older workers were being targeted for discipline and termination and that Mr. Passmore and Mr. Marsden made ageist comments to him on at least two occasions. Mr. Ortiz states that this environment caused him "emotional distress, depression and made it difficult to sleep at night." (Id. at 17). He adds that he took medication to alleviate these conditions. (Id.). Under these facts, the Court finds that Mr. Ortiz satisfies the first two prongs of the prima facie test for Hostile Workplace Discrimination–the harassment that he alleges was unwelcome and because of race or age. The third and fourth prongs, however, are deserving of more scrutiny by the Court.

**1) Harassment that Alters the Terms and Conditions of Employment**

In order to show that harassment in the workplace is so prevalent and abusive that it creates a hostile work environment, a Plaintiff must show that the offending behavior was "both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). Defendants claim that Mr. Ortiz cannot satisfy this prong of the inquiry because the level of

1  harassment that Mr. Ortiz experienced was not severe enough.  While Allied concedes that Mr. Ortiz

2  did hear Mr. Marsden use "the 'N' word" on one occasion, Defendants point out that Mr. Ortiz never

3  directly heard anyone use a racial slur against Latino employees and that his testimony about any such

4  comments that he heard second-hand are too vague to be credited.  Defendants remind the Court that

5  "simple teasing. . .offhand comments, and isolated incidents (unless extremely serious) will not

6  amount to discriminatory changes in the terms and conditions of employment." (Defs' Mot. at 14-15,

7  citing Faragher, 524 U.S. at 788.)  Keeping this standard in mind, the Court now turns to the

8  determination of whether or not the harassment Mr. Ortiz allegedly experienced while at U.S.

9  Disposal was egregious enough to raise an issue of fact as to his hostile workplace claims for trial.

10

11              **a.  Objectively Offensive**

12          When assessing the objective portion of a plaintiff's claim, the Court assumes the perspective

13  of the reasonable victim.  Harris, 510 U.S. at 22. In determining whether harassment in a plaintiff's

14  workplace was sufficiently severe or pervasive to be actionable, courts must look at all the

15  circumstances, including the frequency of the discriminatory conduct, its severity, whether it is

16  physically threatening or humiliating or a mere utterance, and whether it unreasonably interferes with

17  an employee's work performance.  Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir.

18  2003).  The required level of severity or seriousness varies inversely with the pervasiveness or

19  frequency of the conduct.  Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864, 872 (9th

20  Cir. 2001).  In cases where several incidents occur over time, the Court must aggregate the

21  occurrences and analyze the situation as a whole to determine if a hostile workplace existed.

22  Williams v. General Motors Corp., 187 F. 3d 553, 562-3 (6th Cir. 1999).  Additionally, the Court

23  notes that the Plaintiff need not be present and a racial or ageist comment need not be aimed at him in

24  order to be relevant to the totality of the circumstances in a hostile work environment inquiry.

25  Schwapp, 118 F. 3d 106, 111 (2nd Cir. 1997).

26

ORDER - 15

In this matter, it is true that Mr. Ortiz alleges that he only personally heard one racist remark by Dan Marsden and that he only had a few ageist comments spoken directly to him. However, these type of comments are not the only types of harassment that can impact the work environment. Id. Mr. Ortiz also testified that minorities were treated as if they were "dirty" and were not allowed in the office, even if access to the office would facilitate their work. (Ortiz Decl. at 9). He claims that he heard complaints from numerous other minority employees that four managers made racial comments. (Id. at 7). He alleges that older, minority workers were targeted for discipline and fired and replaced by less experienced, white relatives and friends of Mr. Passmore, who shared his racist views. (Id. at 8-9). He has submitted an expert report that supports his claim that younger, white workers were getting paid more for similar work than older, minority workers. (Bonnell Decl. 4-6). Working an environment where all of these alleged circumstances simultaneously existed would likely be objectively offensive to an older minority worker and raises an issue of fact for trial as to whether or not a reasonable person in Mr. Ortiz' position would have found the work environment at U.S. Disposal offensive.

### b. Subjectively Offensive

If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment. Nichols, 256 F.3d at 873 (quoting Harris, 510 U.S. at 21-22). Hence, the Court must determine whether Plaintiff, by his conduct, indicated that the alleged harassment was unwelcome. Id. In the case at hand, Mr. Ortiz has stated that he commented to Dan Marsden that he thought the differences in the way people were treated at U.S. Disposal was unfair. (Ortiz Decl. at 16). He also states that these conditions caused him emotional distress and depression. (Id. at 17). Finally, he notes that he signed the petition of complaint that was signed by approximately sixty Allied employees in June 2001. (Id.). This petition addressed, in part, some of the alleged racial tensions that existed at the Allied companies in Seattle. All of these

behaviors succeed in raising an issue of fact for trial as to whether or not Mr. Ortiz found the

conditions at U.S. Disposal subjectively offensive.

### 2) Harassment that can be Imputed to Allied

When evaluating whether or not an employer is liable for the harassment of its employees by

supervisors, the U.S. Supreme Court has adopted a vicarious liability standard.  Burlington Indus.

Inc., v. Ellerth, 524 U.S. 742, 765.  The justification for heightened liability when supervisors are

responsible for the creation of a hostile work place is that supervisors are able to use their position

within an organization to bring the weight of the organization to bear on an employee.  Holly D. v.

California Institute of Technology, 339 F. 3d 1158, 1173 (2003).  When a tangible employment

action such as discharge, demotion, or undesirable reassignment occurs as a result of the hostile

workplace created by a supervisor, there is no defense to this liability.

Mr. Ortiz alleges that managers at Allied who held positions above his made racist and ageist

remarks, targeted him for discipline because of his age and race, and eventually terminated him.  If

Mr. Ortiz proves these allegations at trial, he will be able to demonstrate that the hostile work

environment he claims he experienced was imputable to Allied.  His allegations and the evidence

submitted at this juncture raise an issue of fact on this point that is more properly resolved by a jury.

### D.  Violation of Public Policy

Plaintiff Ortiz relies on Thompson v. St. Regis Paper Co., 102 Wn. 2d 219 (1984), to support

his claims that Rabanco's treatment of him violated public policy.  However,  Thompson is not an

employment discrimination case–it addresses the claims of a plaintiff who was dismissed from his job

after seventeen years of service without being given a reason, in contravention of contract principles.

Id.  In Thompson, the Washington Supreme Court recognized for the first time that a tort claim could

exist for discharge in violation of public policy.

Defendants argue that Mr.Ortiz' claim should be dismissed because there is an adequate remedy for the injuries he claims provided under the WLAD.  Defendants are correct.  In <u>Korslund v. Dyncorp Tri-Cities, Inc.</u>, 156 Wn. 2d 168 (2005), plaintiffs alleged that they had been discharged in violation of public policy for being whistle blowers regarding safety issues at the Hanford power facility. There, the Washington Supreme Court held that plaintiffs had adequate remedies available to them under the Energy Reorganization Act ("ERA") and, therefore, could not proceed on their tort claim in that matter.  <u>Id</u>. at 183.  The same principle applies in this matter and prevents Mr. Ortiz from proceeding with his discharge in violation of public policy tort claim.  Although he is correct that the WLAD does make a strong public policy statement against racial discrimination in the state of Washington, it also provides him with adequate avenues for recovery.  Accordingly, Mr. Ortiz' public policy tort claim should be DISMISSED.

**E.  Retaliation**

Title VII and the WLAD also protect employees against retaliation for engaging in statutorily protected activities targeted at stopping illegal discrimination.  In order to make out a prima facie case for retaliation, Plaintiffs must demonstrate that: "(1) they were engaged in statutorily protected activities, (2) an adverse employment action was taken, and (3) the statutorily protected activity was a substantial factor in the employer's adverse employment decision." <u>Schonauer v. DCR Entertainment</u>, 79 Wn. App. 808, 827 (1995). Defendants allege that Mr. Ortiz does not satisfy the first prong of this test because he does not demonstrate that he engaged in any oppositional activity.  In fact, observe Defendants, Mr. Ortiz claims that he never officially complained about the alleged discrimination that he suffered while at U.S. Disposal. (Ortiz Dep. At 247, lns. 11-15).  In his Response and supporting materials, Mr. Ortiz points to no behavior on his part that constituted a statutorily protected activity for which he was retaliated against by Defendants, other than seemingly casual comments to Mr. Marsden and Mr. Love (Pl's Resp. at 20-21; Ortiz Decl. at 16).  Instead, he

1   concentrates on establishing that his termination/resignation constituted an "adverse action."

2   However, the Court need not reach this issue because Plaintiff has not provided it with evidence that

3   he meets the first prong of the prima facie test for retaliation.   For this reason, the Court GRANTS

4   summary judgment as to Defendants' motion against Mr. Ortiz on this point.

**F.  Overtime Compensation Violation, Willful Withholding of Wages, and Meal/Rest Break Claim**

In Plaintiffs' Amended Complaint in this matter, Mr. Ortiz alleges that he was not paid overtime, that wages (his overtime) were willfully withheld from him, and that he was not given appropriate meal and rest breaks during his tenure at U.S. Disposal, in violation of Washington state statue. (Dkt. No. 281 at 32). Defendants move to dismiss all of these claims, stating that Mr. Ortiz was not entitled to overtime because he fits the "executive" exception to overtime compensation under Washington's Minimum Wage Act ("MWA"), RCW §49.46 et seq.  Defendants also note, in their Reply, that Mr. Ortiz fails to submit any evidence or argument regarding his meal/rest break claim.  The Court cannot find any argument in support of this claim in Mr. Ortiz' pleading. Accordingly, his meal/rest break claim is DISMISSED.

Under the MWA, employers bear the burden of demonstrating that employees are not due overtime payment because they fit into an "exempt" category.  Drinkwitz v. Alliant Techsystems, Inc., 140 Wn. 2d 291, 301 (2000).  Plaintiff observes that the personnel action request filled out regarding Mr. Ortiz when he was hired at U.S. Disposal specifies that he is overtime eligible. (Spataro Decl., Ex. A). However, Defendants note that auditors who evaluated Allied's payment of overtime to its workers agreed that Mr. Ortiz was properly classified as an "exempt" employee. (Defs' Mot. at 22).

The MWA allows exempt status for employees acting as executives who are (1) paid more than $250 per week, (2) engaged in duties primarily consisting of management of the enterprise or a

1   department thereof, and (3) regularly direct the work of two or more employees.  WAC 296-128-

2   510(6).  Defendants argue that there is no question that Mr. Ortiz was paid more than $250 per week.

3   The Court agrees.  Additionally, Mr. Ortiz admits that he directed the work of nine yard waste crews,

4   or about 12-15 men, on any given day.  (Ortiz Dep. at 264, lns. 13-21).   The real dispute between

5   the parties on this claim is whether or not Mr. Ortiz' primary duties consisted of management.  The

6   standards for determining whether or not an employee is an exempt "executive" under the MWA are

7   very similar to those set forth in the analogous federal statute, the FLSA. Crow v. Energy Northwest,

8   Inc., 121 Wn. App. 1042 (2004).  The FLSA gives examples of several employee activities that are

9   managerial in nature, and which might be undertaken by employees who are considered to meet the

10   exempt status of executives:

11

12              (a) interviewing, selecting, and training employees; (b) setting and adjusting
               employees' rates of pay and hours of work; (c) directing employees' work; (d)
13              maintaining employees' production or sales records for use in supervision or control;
               (e) appraising employees' productivity and efficiency for the purpose of recommending
14              promotion or other changes in employee status; (f) handling employees' complaints
               and grievances and handing out discipline when necessary; (g) planning employees'
15              work; (h) determining the techniques used in the work; (I) apportioning the work
               among the employees; (j) determining the type of materials, supplies, machinery, or
16              tools to be used; (k) controlling the flow and distribution of material or supplies; and
               (l) providing for the safety of employees and the employer's
17
               property.
18

19   Id. (citations omitted). Generally, executive level employees will spend at least fifty percent of their

20   time engaged in these type of managerial activities.  Id.  However, the percentage of time spent at

21   these tasks is not dispositive and the primary character of Plaintiff's duties must also be taken into

22   account.  Palazzolo-Robinson v. Sharis Management Corp., 68 F. Supp. 2d 1186, 1190 (W.D. Wash.

23   1999).  Here, Mr. Ortiz claims that 65% of his time was devoted to collecting garbage and that 10%

24   of his time was devoted to other road tasks, such as taking drivers to the hospital or investigating

25   accidents.  The other 25% of Mr. Ortiz' time was devoted to office work. (Ortiz Decl. at 2-3).  Under

26

these calculations, approximately 35% of Mr. Ortiz' time appears to be spent in managerial type activities, that might cause him to be an exempt employee. Defendants argue that Mr. Ortiz' failure to spend more of his time on managerial activities is one factor that led to his termination.  Plaintiff disputes the amount of discretion he had in terms of the execution of his job and the level of control he exercised over other employees.  Viewing the disputed facts at issue in the light most favorable to Plaintiff, the Court finds that the issue of whether or not Mr. Ortiz qualified for "exempt" executive status or is due overtime wages is an issue most properly resolved by the jury in this matter.  The Court DENIES summary judgment on the issue of whether or not Mr. Ortiz is owed overtime wages by Allied.

Plaintiff also brings a claim for willful withholding of wages.  Normally, the determination of whether or not withholding of wages by an employer is willful is a factual question. Schilling, 136 Wn. 2d 152, 160 (1998).  However, where the material facts are not disputed, a court may dispose of this claim on summary judgment. Id. A Defendant may successfully refute a charge that its withholding of a wage owed to an employee was  "willful" if a bona fide dispute exists as to whether or not the wage is owed. Id.  Here, the parties do not dispute that although Mr. Ortiz' paperwork states that he is overtime eligible, state auditors found that he was properly classified as "exempt." Because of this particular circumstance, the Court finds that there is a bona fide dispute as to whether or not Mr. Ortiz is due overtime wages.  Accordingly, the Court GRANTS summary judgment in Defendants' favor on the issue of willfulness.

**G.  Negligent Supervision and Training**

In the Amended Clarification of Complaint Claims and Complaint Amendments (Dkt. No. 281), Plaintiffs assert generally that Defendants are liable for the negligent supervision and training of their employees and failed to take reasonable corrective action, presumably referring to the events

1   giving rise to this case.  However, Mr. Ortiz does not oppose Defendants' motion to dismiss this

2   claim in his Response.   Beyond the Complaint, the Court does not have any evidence regarding

3   Defendants' alleged supervision, nor can the Court surmise who was allegedly negligently supervised.

4   Plaintiffs may not rely on the pleadings alone to oppose summary judgment but must present evidence

5   showing that there is an issue of fact for trial.  Celotex, 477 U.S. at 323-24.  Because Mr. Ortiz does

6   not meet this burden, his claim of negligent supervision and training is DISMISSED.

7

8   **H. Outrage and Negligent Infliction of Emotional Distress**

9          Defendants do not move here for dismissal of Plaintiff's tort claims of Negligent Infliction of

10  Emotional Distress ("NIED") and Outrage.  However, Defendants did move for dismissal of these

11  claims previously (Dkt. No. 304).  This Court has announced that it will determine for each individual

12  Plaintiff whether or not the factual scenario he presents is sufficient to support these claims at the

13  time Defendants bring a summary judgment motion as to that particular plaintiff. (Dkt. No. 427). In

14  the present case, Mr. Ortiz is not able to raise an issue of fact for the jury that he experienced the

15  level of conduct necessary to support an outrage claim.  Additionally, Mr. Ortiz has not submitted

16  sufficient admissible evidence to support his NIED claim regarding the issue of whether his emotional

17  distress is susceptible to diagnosis and provable via medical evidence.  Haubry v. Snow, 106 Wn.

18  App. 666, 679 (2001).

19

20

21

22

23      **a) Outrage**

24         The tort of outrage requires the proof of three elements: "(1) extreme and outrageous

25  conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of

26  severe emotional distress." Kloepfel v. Bokor, 149 Wn. 2d 192, 195 (2003). An employer may  be

ORDER - 22

held vicariously liable for outrage committed by an employee if the person committing outrage was acting in scope of her employment.  Robel v. Roundup, 148 Wn.2d 35, 53 (2002).  Whether a Plaintiff suffered outrage is normally a question of fact for the jury, but it is initially for the Court as to whether reasonable minds could differ as to whether or not outrage had been committed. Dicomes v. State of Washington, 113 Wn. 2d 612, 630 (1989).

The Court also takes into account that outrage cannot stem from "mere insults, indignities, [or] threats." Kloepfel v. Bokor, 149 Wn. 2d at 196.  Outrage must stem from behavior that is, "'beyond all possible bounds of decency, . . .atrocious, and utterly intolerable in a civilized community.'" Robel, 148 Wn. 2d at 51, (internal citations omitted).  Additionally,  the Court recognizes that under applicable precedent, "[w]orkplace disciplinary actions such as writing administrative reports, receiving oral reprimands, and internal affairs investigations" will not normally support a claim of outrage. Kirby v. City of Tacoma, 124 Wn. App. 454, 474 (2004).  In evaluating whether or not a claim of outrage could result in liability, the Court considers:

> (a) the position occupied by the defendant; (b) whether plaintiff was peculiarly susceptible to emotional distress, and if defendant knew this fact; (c) whether defendant's conduct may have been privileged under the circumstances; (d) the degree of emotional distress caused by a party must be severe as opposed to constituting mere annoyance, inconvenience or the embarrassment which normally occur in a confrontation of the parties; and, (e) the actor must be aware that there is a high probability that his conduct will cause severe emotional distress and he must proceed in a conscious disregard of it.

 Birklid v. Boeing, 127 Wn. 2d 853, 867 (1995), (internal citations omitted). In considering these factors, the Court recognizes that "'added impetus' is given to an outrage claim '[w]hen one is a position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and comments.'" Roebel, 148 Wn. 2d at 52 (quoting Contreras v. Crown Zellerbach Corp., 88 Wn. 2d 735, 741 (1977)).

The Court has extensively examined the factual records for Plaintiff Ortiz. The multiple incidents of explicit and veiled harassment and racial hostility and age discrimination that he allegedly experienced is noted above.  Also noted is the fact that many of these comments were made by people in positions of authority, or those perceived to have authority.  Nonetheless, the incidences of racial harassment that Plaintiff reports are largely incidents or comments that he heard about via other co-workers, but which he himself did not experience.  Based on this record, the Court does not find that reasonable minds could differ as to whether Mr. Ortiz experienced behavior rising to the level of outrage.  Although being subjected to discriminatory and hostile atmosphere that Plaintiff complains of would certainly be uncomfortable and offensive, Washington courts expect Plaintiffs to "be hardened to a certain degree of rough language, unkindness and lack of consideration." Grimsby v. Samson, 85 Wn. 2d 52, 59 (1975).  For these reasons, the Court DISMISSES Plaintiff's Outrage claim.

**b) Negligent Infliction of Emotional Distress**

In order to support a claim for negligent infliction of emotional distress, a plaintiff must, "establish a duty, a breach, proximate cause, and damage or injury." Haubry, 106 Wn. App. at 678. In establishing the injury, Plaintiff must submit admissible evidence that he suffered from a diagnosable emotional disorder. Id. at 679.  Mr. Ortiz has submitted no admissible evidence to corroborate his assertion that he suffered from a diagnosable disorder because of his emotional distress. For this reason, his claim on this issue must also be DISMISSED.

CONCLUSION

The Court DENIES Defendants' Motions to Strike the declaration of Mr. Ortiz  and the expert report of Ms. Bonnell.  The Court also DENIES Defendants' Motion to strike the exhibits attached to the declaration of Mr. Moote.  Additionally, the Court GRANTS Summary Judgment as

to Plaintiff Ortiz' Title VII Discrimination, Retaliation, Violation of Public Policy, Negligent

Supervision and Training, Meal/Rest Break Violation, Willful Withholding of Wage,  Outrage, and

Negligent Infliction of Emotional Distress Claims and DENIES Summary Judgment as to Plaintiff

Ortiz' state Disparate Treatment, Hostile Work Place, and Overtime Wage Violation claims.

The Clerk of the Court shall direct a copy of this order be sent to all counsel of record.

Dated: July 5th, 2006

_Marsha J. Pechman_

Marsha J. Pechman
United States District Judge