UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANDRE JONES, et al.,<br><br>Plaintiff(s),<br><br>v.<br><br>RABANCO, Ltd., et al.,<br><br>Defendant(s). | No. C03-3195P<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF PLAINTIFF DAVID READER |

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment Dismissing Claims of Plaintiff David Reader (Dkt. No. 399). Having considered Defendants' Motion, Plaintiff Reader's Opposition, Defendants' Reply and all other documents and papers pertinent to this motion, the Court DENIES Defendants' Motion to Strike portions of the declaration of Mr. Reader. The Court also GRANTS Summary Judgment as to Plaintiff Reader's Disparate Treatment, Retaliation, Violation of Public Policy, Negligent Supervision and Training, and Outrage claims and DENIES Summary Judgment as to Plaintiff Reader's Hostile Work Environment and Negligent Infliction of Emotional Distress Claims.

BACKGROUND

Plaintiff David Reader began working for U.S. Disposal, a subsidiary of Defendant Allied Waste, in September 1998. Mr. Reader, an African-American, was hired to be a driver for Recycle Seattle, which was a division of US Disposal, that was later acquired by Allied Waste. Allied Waste also owns Rabanco and Emerald Disposal. All Defendants in this lawsuit are collectively referred to as "Rabanco" for the purposes of this Order.

ORDER - 1

Mr. Reader was first a member of the Local 117 Union and then became a member of the Local 174 union in May 2005. Between 1998 and 2000, Mr. Reader states that he was a curbside recycling driver. In this job, he drove a rear-loading garbage truck that had "Rabanco" written on the side of it, along with Rabanco's phone number, in case clients wanted to call and talk to a Rabanco representative. He also wore a uniform on which the word "Recycle" was written. About six months into Mr. Reader's employment with Rabanco, he was elected as a "lead man" and received a slight pay raise. The new position also came with new responsibilities and he was responsible in that position for doing some apartment recycling work.

In April 2000, Mr. Reader switched to doing exclusively apartment recycling work. At this time, he was switched to the payroll of David R. Craig Construction ("DRC"), who had a sub-contract with Rabanco to do the apartment recycling. Through a preferential bidding process with the City of Seattle to award contracts to minority-owned businesses, DRC won a contract to collect apartment recycling. DRC's cooperative sub-contract with Rabanco allowed both companies to benefit from this contract. Mr. Reader claims that he was loaned to DRC from Rabanco at this time. (Reader Dep. at 49, ln. 9-10). Defendants, on the other hand, state that Mr. Reader became an employee of DRC, which was owned in no part by Rabanco and which operated independently to collect apartment recycling under a contractual agreement with Rabanco. Under their contract, Rabanco was to pay DRC the costs of collecting the recycling (including costs for personnel), plus a percentage. (West Decl., Ex. B at 5). DRC, in exchange, was to collect all apartment recycling and furnish: "all labor and employees, tools, equipment. . .supplies, utility services, fuel and other materials, including but not limited to all collection vehicles. . ." (Id. at 2). The contract between Rabanco and DRC also provided:

> DRC shall indemnify, defend and hold harmless USD and its officers, directors, agents, affiliates and employees from and against any and all liabilities, suits, actions, legal proceedings, claims, demands, damages, injuries (including death), costs and expenses (including attorneys' fees) that arise out of, result from or are connected with any act or omission of DRC or its agents or employees in the performance of DRC's obligations under this Subcontract, including by not limited to all claims arising out of injury and illness, disability or death of any of DRC's employees.

ORDER - 2

(Id. at 7). In spite of this agreement, Mr. Reader testified that he still wore the same uniform to work, drove a truck that said "Rabanco" on the side, worked out of the same office at the Allied Waste headquarters in Seattle, and carried a business card that bore Rabanco's name (See Reader Decl., Ex. 1). Although he understood himself to be employed by DRC, he also understood himself to work for Rabanco. He states that Dennis Craig, manager of DRC, told him to do everything that Allied wanted him to do. (Reader Decl. at 5). He also notes that Allied had control over his work and could hire, fire and discipline him, although he admits in his deposition that he never witnessed anyone who worked for DRC being fired or disciplined by Rabanco. (Id. at 7; Reader Dep. at 109-110). The contract between Rabanco and DRC states that Rabanco "shall have the right to monitor DRC's performance of the Subcontract Services by having its employees accompany DRC drivers and/or otherwise." (West Decl., Ex. B at 3).

During the time period from when Allied bought Rabanco and its Seattle subsidiaries until the present, Mr. Reader states that he has experienced a racially charged work environment. (Reader Dep. at 121). He notes that he was referred to as "boy" on one occasion by Dan Marsden during a meeting. At that same meeting, Carl Passmore patted him on the head, which he also found offensive. On several other occasions, he testifies, he heard the Gary and Carl Passmore and Dan Marsden using the term "boy" to refer to other minorities. Another driver used the word "n—er" in his presence. On at least one occasion, he witnessed minority employees who had been lined up to receive discipline in a humiliating way and the Passmore brothers laughing about it. Mr. Reader also claims that Jeff West, a Rabanco manager, pinned him against the wall in a threatening way once when he was bringing another minority worker into the office. Mr. West denies this claim.

Mr. Reader states that all of this behavior made him feel so threatened that he was afraid to complain or report it. He alleges that this work environment has made him very stressed and edgy–so much so that he has a hard time relating to his wife and children and is overly sensitive to mundane insults in a way that he was not before he started working at Rabanco. He submits a declaration of Dr. Charles Freeman, who has diagnosed him with Adjustment Disorder with Mixed Emotional

Features that Dr. Freeman believes are "related to the threat and discrimination [Mr. Reader experienced] on a more probable than not basis." (Reader Decl., Ex. 5).

In 2004, the contract between DRC and Rabanco terminated early and Mr. Reader was again put on the Rabanco payroll. He took a slight pay cut at this time. Mr. Reader still currently works for Rabanco.

## ANALYSIS

**I. Summary Judgment Analysis**

This matter is before the Court on Defendants' motion for summary judgment. Summary judgment is not warranted if a material issue of fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. Id. at 324.

**II. Evidentiary Issues**

Before ruling on the substance of Defendants' motion to dismiss Mr. Reader's claims, the Court will first address the materials submitted by Plaintiff in support of his case that Defendants ask to be struck. Proceeding in this manner allows the Court to rule on the evidentiary value of the documents offered as evidence before considering them in the legal analysis of Mr. Reader's claims.

ORDER - 4

The Court notes that all of the citations for the material that Defendants are requesting to be struck appear in footnotes to Defendants' Reply.  Counting by the line numbers running down the side margins of the pleading paper on which Defendants' Reply is submitted, the Court counts approximately 63 line numbers that are taken up by footnotes in this document. This large amount of footnoting is especially notable because approximately two lines of footnotes fit between each line number.  The Court conservatively estimates that if reprinted in 12 point, double-spaced font, the footnotes in the Reply alone would take up at least three pages of text, which would bring Defendants' Reply to at least fifteen pages.  Local Rule 7(e)(3) limits Reply briefs to twelve pages on summary judgment.  Defendants have not asked for permission to file an overlength brief in this instance and the Court has not made such an allowance.  For this reason, the Court STRIKES all of the footnotes contained in Defendants' Reply brief.  The Court will not tolerate this type of abuse of its local rules.

As stated in an earlier Order, the Court will not dig through affidavits without the aid of pinpoint cites to guide it to the allegedly offensive material Defendants would like to have struck. See Orr v. Bank of America, 285 F. 3d 764, 775 (9th Cir. 2002). Because Defendants have presented their pinpoint cites in an unacceptable format, the Court will DENY Defendants' motion to strike for the time being.  However, the Court will not rely on any material that it deems in its own judgment to not satisfy evidentiary standards and will not allow such material to come in at trial.

**III. Summary Judgment on Plaintiff Reader's Claims**

Defendants are moving to dismiss all of the claims that Mr. Reader has asserted against them on the basis that Mr. Reader was not an employee of Rabanco during the time period around which this litigation centers.  Defendants also allege that, even if Mr. Reader can show that he was a Rabanco employee, he cannot raise material issues of fact on any of his claims.  Plaintiff David Reader is bringing claims for disparate treatment and hostile work environment under the Washington Law Against Discrimination ("WLAD"), RCW §49.060.030, et seq. and 42 U.S.C. §1981, Hostile Work Environment Public Policy Violation under Washington's common law, as well as Negligent

ORDER - 5

Supervision and Training, and Negligent Infliction of Emotional Distress and Outrage. (See "Amended Clarification of Complaint Claims and Complaint Amendments," Dkt. No. 281).

**A. Was Mr. Reader a Rabanco Employee?**

Defendants state that Mr. Reader cannot have been a Rabanco employee from April 2000 until 2004, when Mr. Reader was placed back on the Rabanco payroll. Defendants argue that because Mr. Reader was not an employee during this time, he cannot bring claims for alleged discrimination and hostile workplace violations that occurred during this period. Plaintiff, on the other hand, argues that under both Washington and federal law, Mr. Reader should be considered a Rabanco employee, even while he was on the DRC payroll, because Rabanco always had the ability to control his employment. The Court follows Plaintiff's interpretation of the law because, construed in the light most favorable to Mr. Reader, the factual analysis that the Court must perform to decide whether or not he was Rabanco's employee weighs most heavily in his favor under both federal and state law.

**1) Mr. Reader's Federal Claims**

Title VII makes it an "unlawful employment practice for an employer to fail or refuse to hire. . .any individual. . .because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a). Under 42 U.S.C. §1981, both independent contractors and employees are protected from employment discrimination. Wortham v. American Family Ins. Group, 385 F. 3d 1139, 1141 (8th Cir. 2004). Mr. Reader appears to only be bringing claims under 42 U.S.C. §1981, which protects an individual's right to make a contract. However, Rabanco claims that Mr. Reader is neither an employee, nor an independent contractor, because he was not the party who contracted with Rabanco. Under Defendants' analysis, Mr. Reader is foreclosed from all federal relief for alleged employment discrimination. In order to determine whether or not any type of employment relationship existed in this case during the relevant time period, the Court conducts a "fact-specific inquiry which 'depends on the economic realities of the situation.'" Adcock, 166 F. 3d at 1292. The most important factor for courts to consider is the employer's right to control the "means and manner

ORDER - 6

of the worker's performance." Id. Additionally, courts must consider the occupation itself, whether or not the worker works under the supervision of a supervisor or is a specialist who works with little to no supervision, whether the employer provides the supplies and means to accomplish the work, how the employee is paid, who pays social security taxes, the termination (if any) of the work relationship between the parties, and the parties' intent. Id.

The majority of these factors, though not all, argue in favor of finding that Plaintiff was an employee of both Rabanco and DRC during the relevant time period. Plaintiff continued to work out of the Rabanco facility and used Rabanco trucks to complete his work. Having reviewed Mr. Reader's affidavit and deposition, as well as the affidavits supplied by Defendants, it is clear to the Court that Rabanco supervisors were in direct and constant contact with Mr. Reader during the time he also worked for DRC. (See Reader Decl. at 5-6). These supervisors reviewed the efficiency of the work performed under the DRC contract and had the power to suggest cost-saving measures, such as personnel cuts, to DRC. (West Decl., Ex. B at 4-5). The fact that they may not have exercised these rights is of no moment. Additionally, Mr. Reader has testified that he understood that he was an employee "on loan" to DRC for the duration of the contract. Although Defendant contests this assertion, factual disputes will be construed in the Mr. Reader's favor on a defense motion for summary judgment. Moreover, the parties' behavior when the contract terminated is consistent with this interpretation because Mr. Reader returned to work at Rabanco. The Court acknowledges that DRC did pay Mr. Reader's salary (which was provided to it under contract by Rabanco) and may have also paid social security taxes for him; however, these two factors do not outweigh the other factors that this Court may take into account. For this reason, the Court finds that Mr. Reader qualifies as Rabanco's "employee" for the purposes of his §1981 discrimination and hostile work environment claims.

**2) Mr. Reader's Claims Under Washington Law**

Washington courts have interpreted the Washington Law Against Discrimination's protection of employees even more broadly than the Federal courts. Under Washington law, independent

contractors, as well as employees are covered by the WLAD. <u>Marquis v. City of Spokane</u>, 130 Wn. 2d 97, 112-13 (1996). Because Washington law is to be interpreted even more broadly than federal law, this Court finds that Mr. Reader also qualifies as an employee for the purposes of suing Rabanco under the WLAD.

### B. Mr. Reader's Disparate Treatment Claims

In order to make out a prima facie case for racial or age discrimination based on disparate treatment under federal law or the WLAD a Plaintiff must demonstrate that he: 1) belongs to protected class; 2) was treated less favorably in the terms and conditions of his employment; 3) than a similarly situated, nonprotected employee. The Plaintiff must also show that he and the comparator were doing substantially the same work. <u>Washington v. Boeing</u>, 105 Wn. App. 1, 13 (2001). Washington has, for the most part, adopted the burden-shifting approach articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), making the test for disparate treatment under the WLAD similar to the federal test for disparate treatment under Title VII and the ADEA. <u>Hill v. BCTI Income Fund-I</u>, 144 Wn. 2d 172, 180 (2001); <u>Johnson v. Express Rent & Own, Inc.</u>, 113 Wn. App. 858, 860, n.2 (2002). Once the Plaintiff has demonstrated that he can make out a prima facie case for disparate treatment, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the way the employee was treated. <u>Johnson v. Dep't of Soc. & Health Servs.</u>, 80 Wn. App. 212, 227 (1996). At this point, the burden falls to the Plaintiff to show that the employer's rationale for its actions is pretextual. <u>Id</u>. An employee can demonstrate pretext by submitting evidence that a non-minority comparator committed infractions that were similarly serious, but was not disciplined to the same degree as the minority or older employee. <u>Id</u>. Although the final burden of proof always rests with Plaintiff under this paradigm, the burden-shifting mechanism was designed to allow Plaintiffs a fair chance at proving discrimination through indirect, circumstantial evidence, as is often necessitated in discrimination cases. <u>Hill</u>, 144 Wn. 2d at 180. Because of the fact-intensive nature of this inquiry, once Plaintiff has demonstrated that he is able to make out a prima facie case of race or age discrimination, summary judgment will generally be inappropriate. <u>Johnson</u>, 80 Wn. App. at 229.

ORDER - 8

Mr. Reader is African-American and meets the definition of a member of a protected class for this claim. In the case at hand, Mr. Reader claims that management at U.S. Disposal targeted him for allegedly calling John Rush, another minority employee anonymously on the phone. (Reader Decl. at 16). Mr. Reader also alleges that he overheard various racial slurs directed at other employees and that Mr. Marsden called him "boy," followed by Mr. Passmore patting him on the head. However, Mr. Reader has presented no substantial evidence that non-minorities were treated differently from him. Indeed, no action appears to have been taken after the investigation into the alleged phone call. Nor has Mr. Reader presented evidence that other non-minority employees of the same rank as him were treated better, received better pay, or other benefits. While Mr. Reader states in his affidavit that Caucasian foremen did not experience a pay decrease, as he did, when he returned to Rabanco's payroll, there is evidence in the record that Mr. Reader was offered a promotion to become a non-union supervisor around this time, but opted to stay as a lead driver because he wanted to retain his union benefits. (Herring Decl. at ¶4). Moreover, Mr. Reader does not support his assertion of discriminatory pay with other evidence beyond his own statement or statements that he made previously to other people. Because Mr. Reader has not presented evidence that comparator employees were treated differently, he has failed to make out a prima facie case for disparate treatment under either the WLAD or 42 U.S.C. §1981. For this reason, the Court must GRANT Defendants' motion for summary judgment as to these claims.

**C. Hostile Work Environment under the WLAD and 42 U.S.C. §1981**

Mr. Reader also claims that he was subject to a hostile work environment under the WLAD and 42 U.S.C. §1981. In order to make out a prima facie case for a hostile work environment, Mr. Reader must show that: 1) he suffered unwelcome harassment; 2) the harassment was because of race or age; 3) the harassment affected the terms and conditions of employment; and 4) the harassment can be imputed to Defendants. <u>Washington v. Boeing</u>, 105 Wn. App. 1, 13 (2001). The claim of hostile work environment is aimed at redressing the wrongs that occur, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal citations omitted).

As part of his hostile workplace claim, Mr. Reader alleges that he heard other employees use the word n---er, that he knew that Gary Passmore fired many minorities with experience and hired his relatives and friends who shared his racist views instead, that he observed minority employees being lined up for discipline outside of the office, and that he heard from other minority co-workers several reports of supervisors such as Gary Passmore and Dan Marsden using racial slurs. (Reader Decl. at 9-10). Mr. Reader also states that Mr. Marsden called him "boy" during a meeting, that Mr. Passmore patted him on the head in a condescending manner, and that Rabanco General Manager Jeff West pinned him up against the wall at one point and threatened him for bringing another minority into the office. (Reader Decl. at 12). This last allegation is contested by Mr. West, but will be construed in Mr. Reader's favor on Defendants' motion for summary judgment. Mr. Reader states that this environment was demeaning and caused him emotional distress so severe that he sought professional treatment. Under these facts, the Court finds that Mr. Reader satisfies the first two prongs of the prima facie test for Hostile Workplace Discrimination–the harassment that he alleges was unwelcome and because of race. The third and fourth prongs are deserving of more scrutiny by the Court.

**1) Harassment that Alters the Terms and Conditions of Employment**

In order to show that harassment in the workplace is so prevalent and abusive that it creates a hostile work environment, a Plaintiff must show that the offending behavior was "both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). Defendants claim that Mr. Reader cannot satisfy this prong of the inquiry because the level of harassment that Mr. Reader experienced was not severe enough. While Rabanco concedes that Mr. Reader did hear Mr. Marsden use the term "boy" and that Mr. Passmore patted him on the head, Defendants assert that the latter action was race neutral and that much of the language that Mr. Reader claims he heard stemmed from tensions between DRC and Rabanco rather than racial animus.

ORDER - 10

Defendants remind the Court that "simple teasing. . .offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (Defs' Mot. at 14-15, citing Faragher, 524 U.S. at 788.) Keeping this standard in mind, the Court now turns to the determination of whether or not the harassment Mr. Reader allegedly experienced while at U.S. Disposal was egregious enough to raise an issue of fact as to his hostile workplace claims for trial.

### a. Objectively Offensive

When assessing the objective portion of a plaintiff's claim, the Court assumes the perspective of the reasonable victim. Harris, 510 U.S. at 22. In determining whether harassment in a plaintiff's workplace was sufficiently severe or pervasive to be actionable, courts must look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere utterance, and whether it unreasonably interferes with an employee's work performance. Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003). The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct. Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864, 872 (9th Cir. 2001). In cases where several incidents occur over time, the Court must aggregate the occurrences and analyze the situation as a whole to determine if a hostile workplace existed. Williams v. General Motors Corp., 187 F. 3d 553, 562-3 (6th Cir. 1999). Additionally, the Court notes that the Plaintiff need not be present and a racial comment need not be aimed at him in order to be relevant to the totality of the circumstances in a hostile work environment inquiry. Schwapp, 118 F. 3d 106, 111 (2nd Cir. 1997).

It is true that Mr. Reader alleges that he only personally heard a few racist comments spoken directly to him. However, these type of comments are not the only types of harassment that can impact the work environment. Id. The Plaintiff states that he heard racial slurs "daily"--so frequently that he cannot remember direct quotes or exact dates (Reader Decl. at 8-9). Mr. Reader also testified that he heard complaints from numerous other minority employees that managers made racial

comments. (Id. at 9). He states that General Manager Jeff West pinned him against a wall for bringing another minority worker into the office. Mr. Reader notes that he was afraid to report any of these problems because he was afraid that he would be retaliated against. A working an environment where all of these alleged circumstances simultaneously existed would likely be objectively offensive to a minority worker and raises an issue of fact for trial as to whether or not a reasonable person in Mr. Reader's position would have found the work environment at U.S. Disposal offensive.

### b. Subjectively Offensive

If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment. Nichols, 256 F.3d at 873 (quoting Harris, 510 U.S. at 21-22). Hence, the Court must determine whether Plaintiff, by his conduct, indicated that the alleged harassment was unwelcome. Id. In the case at hand, Mr. Reader has stated that he told Dan Marsden not to call him boy and that he deserved more respect. (Reader Decl. at 10). He also noted his displeasure with this type of treatment to Mr. Passmore. (Id.). He further states that these conditions caused him emotional distress and depression. (Id. at 11). Finally, he notes that he participated in the NAACP investigation that was conducted in the wake of the petition signed by approximately sixty Rabanco employees. (Reader Decl. at 18-19). This petition addressed, in part, some of the alleged racial tensions that existed at the Allied companies in Seattle. All of these behaviors succeed in raising an issue of fact for trial as to whether or not Mr. Reader found the conditions at U.S. Disposal subjectively offensive.

### 2) Harassment that can be Imputed to Allied

When evaluating whether or not an employer is liable for the harassment of its employees by supervisors, the U.S. Supreme Court has adopted a vicarious liability standard. Burlington Indus. Inc., v. Ellerth, 524 U.S. 742, 765. The justification for heightened liability when supervisors are responsible for the creation of a hostile work place is that supervisors are able to use their position within an organization to bring the weight of the organization to bear on an employee. Holly D. v. California Institute of Technology, 339 F. 3d 1158, 1173 (2003). When a tangible employment

action such as discharge, demotion, or undesirable reassignment occurs as a result of the hostile workplace created by a supervisor, there is no defense to this liability.

Mr. Reader alleges that managers at Allied who held positions above his made racist remarks and threatened him in a racially aggressive manner. If Mr. Reader proves these allegations at trial, he will be able to demonstrate that the hostile work environment he claims he experienced was imputable to Allied. His allegations and the evidence submitted at this juncture raise an issue of fact on this point that is more properly resolved by a jury.

**D. Violation of Public Policy**

Plaintiff Reader asks the Court to consider denying summary judgment on his violation of public policy claim as an alternative route to relief if the Court decides to grant summary judgment on Plaintiff's WLAD claims. As noted above, Mr. Reader's WLAD claims survive summary judgment. Under Thompson v. St. Regis Paper Co., 102 Wn. 2d 219 (1984), the Washington Supreme Court recognized for the first time that a tort claim could exist for discharge in violation of public policy. However, Thompson is not an employment discrimination case–it addresses the claims of a plaintiff who was dismissed from his job after seventeen years of service without being given a reason, in contravention of contract principles. Id.

Defendants argue that Mr. Reader's claim should be dismissed because there is an adequate remedy for the injuries he claims provided under the WLAD. Defendants are correct. In Korslund v. Dyncorp Tri-Cities, Inc., 156 Wn. 2d 168 (2005), plaintiffs alleged that they had been discharged in violation of public policy for being whistle blowers regarding safety issues at the Hanford power facility. There, the Washington Supreme Court held that plaintiffs had adequate remedies available to them under the Energy Reorganization Act ("ERA") and, therefore, could not proceed on their tort claim in that matter. Id. at 183. The same principle applies in this matter and prevents Mr. Reader from proceeding with his discharge in violation of public policy tort claim. Although he is correct that the WLAD does make a strong public policy statement against racial discrimination in the state

ORDER - 13

of Washington, it also provides him with adequate avenues for recovery.  Accordingly, Mr. Reader'ss public policy tort claim should be DISMISSED.

### E. Retaliation

42 U.S.C. §1981 and the WLAD also protect employees against retaliation for engaging in statutorily protected activities targeted at stopping illegal discrimination.  In order to make out a prima facie case for retaliation, Plaintiffs must demonstrate that: "(1) they were engaged in statutorily protected activities, (2) an adverse employment action was taken, and (3) the statutorily protected activity was a substantial factor in the employer's adverse employment decision." Schonauer v. DCR Entertainment, 79 Wn. App. 808, 827 (1995). Rabanco alleges that Mr. Reader suffered no adverse employment action while at Rabanco and notes that Mr. Reader is still employed.  Mr. Reader, however, contends that the investigation into the alleged call he made to John Rush and the fact that his pay rate lowered when he returned to the Rabanco payroll constitute adverse actions.  Although the Ninth Circuit construed the term "adverse action" broadly in Ray v. Henderson, 217 F. 3d 1234 (9th Cir. 2000), to include actions such as having one's office moved or being excluded from meetings, Mr. Reader is unable to point to any tangible negative consequence that the investigation into the phone call had for his job at Rabanco. Additionally, there is no evidence that Mr. Reader's pay cut was because he was demoted.  Instead, it appears that he was merely paid what he was due under the union contract.  For this reason and because Mr. Reader does not actually plead retaliation in the final version of the Amended Complaint, the Court GRANTS summary judgment as to Defendants' motion against Mr. Reader on this point.

### F. Negligent Supervision and Training

In the Amended Clarification of Complaint Claims and Complaint Amendments (Dkt. No. 281), Plaintiffs assert generally that Defendants are liable for the negligent supervision and training of their employees and failed to take reasonable corrective action, presumably referring to the events giving rise to this case.  Mr. Reader opposes Defendants' motion to dismiss this claim in his Response only by noting, with no citations to evidentiary support, that Mr. Reader was "subjected to unlawful

discrimination and very offensive conduct." (Pl's Resp. at 22).  Based on this assertion, Plaintiff claims that his negligent training and supervision claim is one for the jury. (Id.).  Beyond the Complaint and Response, the Court does not have any evidence regarding Defendants' alleged supervision, nor can the Court surmise who was allegedly negligently supervised.  Plaintiffs may not rely on the pleadings alone to oppose summary judgment but must present evidence showing that there is an issue of fact for trial.  Celotex, 477 U.S. at 323-24.  Because Mr. Reader does not meet this burden, his claim of negligent supervision and training is DISMISSED.

**G. Outrage and Negligent Infliction of Emotional Distress**

Defendants moved for dismissal of Plaintiff's tort claims of Negligent Infliction of Emotional Distress ("NIED") previously (Dkt. No. 304).  They renew this motion in their current motion. This Court has announced that it will determine for each individual Plaintiff whether or not the factual scenario he presents is sufficient to support these claims at the time Defendants bring a summary judgment motion as to that particular plaintiff. (Dkt. No. 427). In the present case, Mr. Reader is not able to raise an issue of fact for the jury that he experienced the level of conduct necessary to support an outrage claim.  Nonetheless, Mr. Reader has submitted sufficient admissible evidence to survive summary judgment regarding his NIED claim and the issue of whether his emotional distress is susceptible to diagnosis and provable via medical evidence.  Haubry v. Snow, 106 Wn. App. 666, 679 (2001).

**a) Outrage**

The tort of outrage requires the proof of three elements: "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." Kloepfel v. Bokor, 149 Wn. 2d 192, 195 (2003). An employer may be held vicariously liable for outrage committed by an employee if the person committing outrage was acting in scope of her employment.  Robel v. Roundup, 148 Wn.2d 35, 53 (2002).  Whether a Plaintiff suffered outrage is normally a question of fact for the jury, but it is initially for the Court as

ORDER - 15

to whether reasonable minds could differ as to whether or not outrage had been committed. <u>Dicomes v. State of Washington</u>, 113 Wn. 2d 612, 630 (1989).

The Court also takes into account that outrage cannot stem from "mere insults, indignities, [or] threats." <u>Kloepfel v. Bokor</u>, 149 Wn. 2d at 196. Outrage must stem from behavior that is, "'beyond all possible bounds of decency, . . .atrocious, and utterly intolerable in a civilized community.'" <u>Robel</u>, 148 Wn. 2d at 51, (internal citations omitted). Additionally, the Court recognizes that under applicable precedent, "[w]orkplace disciplinary actions such as writing administrative reports, receiving oral reprimands, and internal affairs investigations" will not normally support a claim of outrage. <u>Kirby v. City of Tacoma</u>, 124 Wn. App. 454, 474 (2004). In evaluating whether or not a claim of outrage could result in liability, the Court considers:

> (a) the position occupied by the defendant; (b) whether plaintiff was peculiarly susceptible to emotional distress, and if defendant knew this fact; (c) whether defendant's conduct may have been privileged under the circumstances; (d) the degree of emotional distress caused by a party must be severe as opposed to constituting mere annoyance, inconvenience or the embarrassment which normally occur in a confrontation of the parties; and, (e) the actor must be aware that there is a high probability that his conduct will cause severe emotional distress and he must proceed in a conscious disregard of it.

<u>Birklid v. Boeing</u>, 127 Wn. 2d 853, 867 (1995), (internal citations omitted). In considering these factors, the Court recognizes that "'added impetus' is given to an outrage claim '[w]hen one is a position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and comments.'" <u>Roebel</u>, 148 Wn. 2d at 52 (quoting <u>Contreras v. Crown Zellerbach Corp.</u>, 88 Wn. 2d 735, 741 (1977)).

The Court has extensively examined the factual records for Plaintiff Reader. The multiple incidents of explicit and veiled harassment and racial hostility that he allegedly experienced is noted above. Also noted is the fact that many of these comments were made by people in positions of authority, or those perceived to have authority. Nonetheless, many of the incidences of racial harassment that Plaintiff reports are incidents or comments that he heard about via other co-workers, but which he himself did not experience. Based on this record, the Court does not find that

ORDER - 16

reasonable minds could differ as to whether Mr. Reader experienced behavior rising to the level of outrage. Although being subjected to discriminatory and hostile atmosphere that Plaintiff complains of would certainly be uncomfortable and offensive, Washington courts expect Plaintiffs to "be hardened to a certain degree of rough language, unkindness and lack of consideration." <u>Grimsby v. Samson</u>, 85 Wn. 2d 52, 59 (1975). For these reasons, the Court DISMISSES Plaintiff's Outrage claim.

### b) Negligent Infliction of Emotional Distress

In order to support a claim for negligent infliction of emotional distress, a plaintiff must, "establish a duty, a breach, proximate cause, and damage or injury." <u>Haubry v. Snow</u>, 106 Wn. App. 666, 678 (2001). In Washington, an employer may be liable where its negligent actions injure an employee–thus, the employer has a duty of care to not engage in or tolerate behaviors that are injurious to its employees. <u>Id</u>. at 678. In establishing the injury, Plaintiff must submit admissible evidence that he suffered from a diagnosable emotional disorder. <u>Id</u>. at 679. Mr. Reader has provided such evidence in the instant case through the affidavit of Dr. Freeman, who details his treatment of Mr. Reader and affirms that Mr. Reader suffers from Adjustment Disorder with Mixed Emotional Featres. (Freeman Decl. at 1, ¶2). Dr. Freeman links these disorders to the alleged harassment that Plaintiff Burton endured at Rabanco. (<u>Id</u>. at 1, ¶3). Plaintiff Reader has succeeded in raising an issue of fact as to all of the elements of his NIED claim. For this reason, the Court DENIES summary judgment on this cause of action.

### CONCLUSION

The Court DENIES Defendants' Motion to Strike portions of the declaration of Mr. Reader. The Court also GRANTS Summary Judgment as to Plaintiff Reader's Disparate Treatment, Retaliation, Violation of Public Policy, Negligent Supervision and Training, and Outrage claims and DENIES Summary Judgment as to Plaintiff Reader's Hostile Work Environment and Negligent Infliction of Emotional Distress Claims.

The Clerk of the Court shall direct a copy of this order be sent to all counsel of record.

Dated: September 6th , 2006

*Marsha J. Pechman*
Marsha J. Pechman
United States District Judge

ORDER - 18